NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL 542, INTERNATIONAL UNION
OF OPERATING ENGINEERS,
AFL-CIO, Respondents.

No. 14549.

United States Court of Appeals
Third Circuit.

Argued Jan. 22, 1964.

Decided April 27, 1964.

**100**

James C. Paras, N. L. R. B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Melvin J. Welles, Lee M. Modjeska, Attorneys, N. L. R. B., on the brief), for petitioner.

Abraham E. Freedman, Philadelphia, Pa. (Martin J. Vigderman, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for respondent.

Before BIGGS, Chief Judge, and FORMAN and GANEY, Circuit Judges.

FORMAN, Circuit Judge.

The National Labor Relations Board (hereafter the Board) has petitioned this court for enforcement of a cease and desist order against respondent, Local 542 of the International Union of Oper-

ating Engineers, AFL-CIO [1] (hereafter the Union).

The pertinent facts are as follows:

R. S. Noonan, Inc. (hereafter the Employer) is a Pennsylvania corporation engaged as a general contractor in the construction industry with principal offices in York, Pennsylvania. The interstate character and volume of its business present the necessary jurisdictional features.

Beginning on May 1, 1952, the Employer and the Union entered into a series of collective bargaining agreements in which the Union was recognized as the bargaining representative for employees performing work traditionally done by operating engineers within an area including York and 28 other counties in eastern Pennsylvania. The last of these agreements expired on April 30, 1961.

The Employer was a member of the General Building Contractors Association of Philadelphia with which the Union had a collective bargaining agreement expiring April 30, 1963. This contract, however, covered only five counties in and around Philadelphia and did not include York County.

During the latter part of April 1962, the Union unsuccessfully sought a bargaining agreement with the York County Contractors Association, in which the Employer was also a member, for the 29 counties in eastern Pennsylvania. At the same time, agents of the Union solicited Raymond S. Noonan, the Employer's president, to sign a new contract directly with the Union for the 29 county area. This he declined to do.

The Employer contemporaneously was engaged in fulfilling contracts for the construction of the following four projects in the York County area: (1) the construction of a freight terminal for Motor Freight Express, Inc., York, Pennsylvania; (2) the alteration of a packing plant for Medusa Portland Cement Co.,

---

1. The decision of the Board and order are reported in Local 542, International Union of Operating Engineers, AFL-CIO and R. S. Noonan, Inc., 142 N.L.R.B. No. 131 (1963).

York, Pennsylvania; (3) the construction of dwelling units for the York Public Housing Authority, York, Pennsylvania; and (4) the construction and installation of a converter for P. H. Glatfelter Co., Spring Grove, York County, Pennsylvania.

In performing work on these projects, the Employer reserved to itself some of the labor and subcontracted the remainder. One subcontract, dated April 20, 1962, was with the Hanover Construction Company which operated on an open shop basis. The Employer did not itself then employ any operating engineers. Indeed, it had not employed operating engineers since 1957. Furthermore, the Union was not the certified representative of the Employer's workers. They were members, instead, of various labor organizations in the building trades field, with whom the Employer had collective bargaining agreements.

About May 1, 1962, the Union began to picket the Employer at the Motor Freight, Medusa, York Public Housing Authority, and Glatfelter projects, with signs stating: "R. S. Noonan, Inc. unfair to Operating Engineers Local 542." The Union subsequently changed these signs to read: "Dispute between R. S. Noonan, Inc., and Operating Engineers Local 542."

On May 16, 1962, the Employer filed unfair labor practice charges with the Board against the Union. It alleged that because the Union's picketing of the York area sites was for an object of recognition or bargaining, and for a period of more than 30 days no petition within the meaning of Section 8(b) (7) (C) of the National Labor Relations Act [2] had been filed, the Union was in violation of that section.

Also on May 16, 1962, the Employer filed a representational petition with the Board. It stated that the Union had asked for recognition in a unit of operating engineers. But, the petition further stated, there being no employees in this unit, the Employer had refused to recognize the Union.

On June 12, 1962, the Regional Director of the Board received a telegraphic request from the Employer asking for the withdrawal of the petition. He approved the request the same day.

Pending the disposition of the unfair labor practice petition of May 16, 1962, the Regional Director of the Board sought an injunction from the United States District Court for the Middle District of Pennsylvania to restrain the Union from continuing its picketing. On June 27, 1962, the court concluded that there was reasonable cause to believe

2. This section, 29 U.S.C. § 158(b) (7) (C) (Supp. IV 1959-1962), provides that it shall be an unfair labor practice for a labor organization or its agents

"(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

\* \* \* \* \*

"(C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commence-

ment of such picketing: *Provided,* That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159(c) (1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further,* That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services."

that the action of the Union violated Section 8(b) (7) (C) aud granted an injunction against it until the Board reached its decision in the dispute.[3]

After a hearing the Board decided that the Union had violated Section 8(b) (7) (C) and directed the Union, among other things, to:

"1. Cease and desist from picketing or causing to be picketed, or threatening to picket or cause to be picketed, R. S. Noonan, Inc., where an object thereof is forcing or requiring said employer to recognize or bargain with it as the representative of its employees in violation of Section 8(b) (7) (C) of the Act."[4]

## I

The Union urges that in May 1962 the Employer already recognized it as bargaining representative and the law should imply, from the surrounding circumstances, that there was an existing collective bargaining agreement between them. The picket signs, it apparently contends, were for the immediate purposes of "inform[ing] the public that the Employer was violating its collective bargaining agreement with the Union by subcontracting work within the Union's category on an open shop basis." It thus submits that even though the Union's ultimate object was to formalize the alleged existing implied contractual relationship, under the second proviso to subparagraph (C) in Section 8(b) (7)[5] the picketing was permissible.[6]

The Union suggests that it achieved representational recognition, in part, from Section 3 of the Five County Bargaining Agreement between it and the General Building Contractors Association of Philadelphia, which reads:

"Section 3. The territorial jurisdiction of the Union covers the eastern half of Pennsylvania and the State of Delaware. This agreement shall apply to all work performed in Philadelphia, Delaware, Bucks, Chester and Montgomery Counties."

The first sentence of the above jurisdictional statement refers to the eastern half of Pennsylvania and the State of Delaware as the geographical area within which the Union was empowered to conduct its operations. The second sentence obviously limits the effect of the agreement to work performed in five counties of the State of Pennsylvania contained within the territorial jurisdiction of the Union.

3. Schauffler v. Local 542, International Union of Operating Engineers, AFL-CIO [Civil No. 7738], 50 LRRM 2691 (1962). In an order of August 7, 1963, the appeal of the Union was dismissed as moot. (3 Cir., No. 14,163).

4. Local 542, International Union of Operating Engineers, AFL-CIO and R. S. Noonan, Inc., supra note 1.

5. This proviso reads:
"*Provided further*, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services." See supra note 2.

6. See Smitley v. N. L. R. B., 327 F.2d 351, 354 (9 Cir. 1964), where the court quotes with approval the following from N. L. R. B. v. Local 3, International Board of Electrical Workers, 317 F.2d 193, 198 (2 Cir. 1963):
" 'It does not necessarily follow that, where an object of the picketing is forcing or requiring an employer to recognize or bargain, the purpose of the picketing, in the context of the second proviso, is not truthfully to advise the public, etc. The union may legitimately have a long range or strategic objective of getting the employer to bargain with or recognize the union and still the picketing may be permissive. This proviso gives the union freedom to appeal to the unorganized public for spontaneous popular pressure upon an employer; it is intended, however, to exclude the invocation of pressure by organized labor groups or members of unions, as such.' ".

▐ Nothing in Section 3, explicitly or implicitly, leads to the conclusion that the parties intended that the members of the association recognize the Union as exclusive bargaining representative in the eastern half of Pennsylvania. Accordingly, there is no substance to the Union's contention that Section 3 provides a basis for holding the Employer recognized it as bargaining representative in York and the other 28 counties in eastern Pennsylvania.

▐ The Union also cites Zdanok v. Glidden Co.[7] to support the position that the Employer's recognition of it as a bargaining representative survived the expiration of their last written contract. The reliance is misplaced. Analysis of Zdanok reveals that it deals not with the survival of union recognition after the expiration of a bargaining agreement. Rather, it deals with the survival of rights vested in employees, such as seniority, where the employer transferred his plant to another city.

Examination of the Union's arguments supporting the notion that the Employer recognized it as bargaining representative are unpersuasive. The Employer did not in any manner whatsoever recognize the Union as bargaining representative after April 30, 1961—the expiration date of their last written 29 county bargaining agreement.

The Union argues that an implied contractual relationship with the Employer existed after the April 30, 1961 termination date. The alleged reason for this is that the Employer continued to file monthly reports until May 15, 1962 with the Union's Health and Welfare Fund and Pension Fund, although the aforementioned written agreement containing such a provision[8] had terminated. The Union points out that the 29 county collective bargaining agreement which was to be effective May 1, 1961, but never signed by the Employer, provides for such filing.

The monthly reports through April 1962 showed no employees and no contributions. Thereafter, a representative of the Union informed the Assistant Office Manager of the Employer that it was unnecessary to send in a report every month when no operating engineers were employed. Hence, in the last report filed on May 15, 1962, the Assistant Office Manager inserted the following notation: "We do not plan to have engineers in the near future. Therefore this is our last report."

▐ The five county Philadelphia agreement with the Union, which ran from May 1, 1961 to April 30, 1963, however, required a submission of monthly reports substantially similar to the expired and unsigned agreements. By making monthly reports after May 1, 1961, the Employer simply was following the mandate of the five county Philadelphia Association agreement. In no wise did this or any other factor presented by the Union imply that the Employer acquiesced in the contractual relationship proposed under the unsigned 29 county agreement. Accordingly, the contention of the Union that an implied contractual relationship existed on May 1, 1962 must fail.

▐ We are in agreement with the Board's holding that the Employer did not recognize the Union as a bargaining representative for the area picketed, and that no implied contractual relationship existed between the Union and the Em

---

7. 288 F.2d 99, 90 A.L.R.2d 965 (2 Cir. 1961), which rev'd 185 F.Supp. 441 (S.D. N.Y.1960); pet'n for reh'g and reh'g en banc denied, 288 F.2d 99 (2 Cir. 1961); cert. granted solely on issue whether Court of Claims Judge on Court of Appeals panel invalidated the decision, 368 U.S. 814, 82 S.Ct. 56, 7 L.Ed.2d 22 (1961); aff'd 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); reh'g denied 371 U.S. 854, 83 S.Ct. 14, 9 L.Ed.2d 93 (1962); concerning retrial on damages, see 216 F.Supp. 476 (S.D.N.Y.1963).

8. The provision required the Employer to make certain payments into a Health and Welfare Fund and a Pension Fund on a man-hour basis for "every operating engineer, oiler and apprentice engineer employed by such employer throughout the period of this contract."

ployer. Consequently, there is no merit in the argument of the Union, that the immediate purpose of its "picket[ing] was to inform the public that the Employer was violating its collective bargaining agreement with the Union by subcontracting work within the Union's category on an open shop basis."

■ Let us assume that the Union was picketing for the primary purpose of advising the public that the Employer did not employ members of, or have a contract with, a labor organization. Its conduct, nevertheless, still should have been prohibited, as an effect thereof, was to induce individuals employed by other persons not to transport goods or perform services.[9] The second proviso in Section 8(b) (7) (C) [10] proscribes this conduct.

## II

■ The Union takes exception to any finding which states that essentially, the object of the picketing was to force the Employer to recognize and bargain with it. In support thereof, it points out that at the time of the picketing there were no operating engineers working for the Employer that the Union could represent. As stated, the Employer had not hired any operating engineers since 1957, nor was it planning to hire any within the foreseeable future.

The Board, on the other hand, states there was no certainty that the Employer never again intended to hire operating engineers. And for this reason, among others, it concludes that the Union wished the Employer to recognize it as the bargaining representative for operating engineers.

The Union's objection to the finding that its picketing was for the object of recognition also lacks merit. Though the Employer had not employed operating engineers since 1957, the Union had seen fit to enter into written collective bargaining agreements with the Employer until they expired on April 30, 1961. By picketing the Employer, the Union wished to restore this status.

Moreover, at the time of the picketing in May, 1962, the Employer was subcontracting work of operating engineers, a practice of course offensive to the Union, to the non-union Hanover Construction Company. Indeed, if the Employer had signed a collective bargaining agreement, it would be reasonable to infer that the Union would have attempted to secure for its members the work within the mechanical jurisdiction of operating engineers.

Accordingly, the object of the Union's picketing, essentially, was to force the Employer to recognize and bargain with it.

## III

■ The Union argues, nonetheless, that its picketing was proper. It points to Sections 8(b) (7) (C) [11] and 9(c) [12] of the National Labor Relations Act which, among other things, validate rec-

9. We agree, as did the Board, with the Intermediate Report filed by the Board's Trial Examiner, George A. Downing, that the picketing had the following effects:

"Around May 2, truckers hauling reinforcing steel from Bethlehem Steel Company to the Motor Freight job refused to cross the picket line to make deliveries. Rodsetters employed by Lucking Brothers, a contractor, to install the reinforcing steel refused to cross the picket line. On the Medusa job, employees of all crafts, including employees of subcontractors, refused to cross the picket line and remained off the job until the entry of the injunction. On the Public Housing Job, employees of the electrical con-

tractor (a prime contractor) refused to cross the picket line. On the Glatfelter job, employees of other prime contractors, as well as Noonan's subcontractors, refused for 3 days to cross the picket line."

10. Supra note 5.

11. Supra note 2.

12. This Section, 29 U.S.C. § 159(c) (1958), as amended, 29 U.S.C. § 159(c) (Supp. IV 1959–1962) states:

"§ 159. Representatives and elections—
    *    *    *    *    *    *
"Hearings on questions affecting commerce; rules and regulations

"(c) (1) Whenever a petition shall have been filed, in accordance with such regu-

ognitional or bargaining picketing when a representational petition is filed with the Board within a reasonable period of time not to exceed thirty days after the commencement of the picketing. Specifically, the Union contends that the Employer's filing of a representational petition on May 16, 1962, in response to the picketing which commenced on May 1, 1962, fulfilled this requirement.

Section 8(b) (7) (C) [13] also provides that if an appropriate petition has been filed, the Board shall forthwith "direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof." Putting to one side that the Employer withdrew the petition on June 12, 1962, with the approval of the Board's Regional Director, it is still apparent this petition was inoperative as a basis for an election.

In the instant case the picketing commenced May 1, 1962, while the Employer had not used operating engineers since 1957. There was, at the time of the picketing, no nucleus of regular operating engineer employees that could have voted in a representational election.

Trammel Construction Company,[14] cited by the Union, is inapposite to the present facts. It dealt with an employer of commercial construction projects which had a nucleus of five regular employees and clearly intended to hire more employees in the future. Therefore, the Board directed that an election be held among a unit consisting of all employees who worked for the employer for at least sixty-five days during the year preceding the eligibility date for the election.

In the present case, to have held an election among the Employer's former operating engineers who worked for the Employer as far back as 1957, as the Union suggests, would have been unreasonable owing, among other things, to the time gap. An election satisfying the requirements of 8(b) (7) (C), consequently, was impossible. This is a sufficient and substantial reason for the ruling by the Board that the Employer's petition was inoperative. Thus we must reject the contention that the filing of the petition by the Employer made the Union's picketing proper.

## IV

The Union takes issue with the conclusion that an election must be feasible before the representational petition could be deemed operative, because this ignores, it asserts, the peculiar circumstances of the construction business, involved herein. In this industry the employer hires workers not on a normal yearly basis but on an irregular job basis. If no construction workers were being employed on or about the time of the filing of a representational petition, elections may be impossible, the Union reasons. It thus suggests that making the election requirement of Section 8(b) (7) (C) applicable to picketing in the construction industry will preclude picketing that will bring about recognition for the purpose of concluding pre-hire agreements.

Congress in Section 8(f) of the National Labor Relations Act [15] has given its sanction to the *voluntary* negotiation of pre-hire agreements in the construc-

---

lations as may be prescribed by the Board—

\* \* \* \* \* \*

"(B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in subsection (a) of this section; the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office,

who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof."

\* \* \*

13. Supra note 2.

14. 126 N.L.R.B. 1365 (1960).

15. This section, 29 U.S.C. § 158(f) (Supp. IV, 1959–1962) provides:

"(f) It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged

tion trade, though no employees may be working in the particular craft unit and the majority status of the union cannot be established. But it is quite another matter to permit picketing of a construction industry employer under the instant circumstances.

Here, aside from the lack of union recognition, there were no union operating engineers working for the Employer during the time of the picketing—May 1 to June 27, 1962. Furthermore, at that time there could have been no formulation of a nucleus of regular employees who had worked for the Employer. In fact, as already related, no member of the Union had worked for the Employer since 1957.

To allow picketing in this case by disregarding the election requirements would be improper. This would license a Union's use of coercion upon an employer to sign a pre-hire agreement, where the majority status of the union could not be established by an election. Congress has not gone so far as to permit picketing

to compel execution of a pre-hire agreement in these circumstances.[16]

## V

The Union points out that Section 8(b)(7) proscribes picketing

"any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of *his employees* * * *." (Emphasis added.) [17]

From this, it argues that the statute's use of the term "his employees" refers only to current employees and not to prospective employees. It thus submits that because no operating engineers were working for the Employer at the time of the picketing, the present case falls outside the limitations of Section 8(b)(7).

To hold that "his employees" refers merely to current employees would bring about an anomalous situation.[18] A union picketing for a recognitional purpose, where the employer currently employs

primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, * * *."

16. See N.L.R.B. v. International Hod Carriers, etc., 285 F.2d 397 (8 Cir. 1960), cert. denied 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 203 (1961), which the Board has brought to our attention. It states at page 403 of 285 F.2d:
"Union also attempts to demonstrate the legality of its objectives by citing us to § 8(f) of the 1959 amendments,

* * *. Although Congress has given validity to such an agreement, *voluntarily* entered into by the parties, we find no congressional approval of the use of strikes or picketing to compel execution of a prehire agreement. Indeed, the legislative history indicates the contrary to be true. The Conference report which deals with the subject, states: 'The conference adopted the provision of the Senate bill permitting prehire agreements in the building and construction industry. Nothing in such provision is intended * * * to authorize the use of force, coercion, strikes, or picketing to compel any person to enter into such prehire agreements.' (Emphasis supplied.)"
Also see Sperry for and on Behalf on N.L.R.B. v. Local Union No. 562, Etc., 210 F.Supp. 743, 747–748 (W.D.Mo. 1962).

17. Supra note 2.

18. See Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, et al. v. National Labor Relations Board, 130 N.L.R.B. 558 (1961), aff'd 113 U.S.App. D.C. 240, 307 F.2d 197 (1962), and Sperry for and on Behalf on N.L.R.B. v. Local Union No. 562, Etc., supra note 16.

workers in the particular craft of the union, would be subject to the requirement that a representational petition be filed within a reasonable period of time not to exceed thirty days. Yet, if there were no current employees and only a possibility of prospective employees, the Union's recognitional picketing would be unaffected by any requirement of filing a petition with the Board, if we accept the construction that the statute applies only to current employees. It then could picket, presumably, ad infinitum. Such a construction would be an unreasonable interpretation of the Act.

As stated in the decision [19] of the Board herein:

"The primary purpose of Section 8(b) (7) is to limit the impact of recognitional or organizational picketing upon an employer or his employees, so that questions of representation may be settled by orderly processes and in accord with the free choice of employees. In our view, a holding here that a union can picket indefinitely to force an employer to sign a prehire contract would run contrary to the purposes of the section."

The contention of the Union, that a proper interpretation of Section 8(b) (7) compels the conclusion that the words "his employees" refer only to current employees, is baseless.

The Union has advanced other points in addition to those discussed herein. Examination thereof leaves us unpersuaded that they are meritorious.

The object of the Union's picketing from May 1 to June 27, 1962, essentially, was to force and require the Employer to recognize and bargain with it. By doing this, without then being certified as the representative of the employees, and because the Employer's representational petition under Section 9(c) was inoperative, the Union engaged

in unfair labor practices within the meaning of Section 8(b) (7) (C) of the National Labor Relations Act.

Therefore, a decree will be entered enforcing the order of the Board in full.

19. Local 542, International Union of Operating Engineers, AFL-CIO and R.S. Noonan, Inc., supra note 1.