**Bernard SAMOFF, Regional Director of the Fourth Region of the National Labor Relations Board, For and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BUILDING AND CONSTRUCTION TRADES COUNCIL OF DELAWARE, Respondent.**

**Civ. A. No. 74–95.**

United States District Court,
D. Delaware.
July 10, 1974.

Peter G. Nash, Gen. Counsel, Washington, D. C., Allen Baron Roberts, Atty., National Labor Relations Board, Philadelphia, Pa., for petitioner.

Harvey B. Rubenstein, Wilmington, Del., for respondent.

Thomas E. Waters, Jr., Norristown, Pa., for the Charging Party.

## OPINION

SCHWARTZ, District Judge.

### NATURE OF THIS PROCEEDING

This proceeding arises under Section 10(*l*) of the National Labor Relations

Act (N.L.R.A.), as amended, 29 U.S.C. § 160(*l*).

The National Labor Relations Board (N.L.R.B.), the Petitioner herein, has filed an administrative complaint against Respondent, Building and Construction Trades Council of Delaware (Council), charging the Council with the commission of an unfair labor practice in violation of Section 8(b)(7)(C) of the N.L.R.A., 29 U.S.C. § 158(b)(7)(C), in connection with picketing by the Council of the construction site of the Newark District Vocational School in Glasgow, Delaware. Simultaneously, Petitioner has moved this Court under Section 10(*l*) for an injunction against the picketing pending the final disposition of the unfair labor practice charge by the N.L.R.B. A hearing was held on May 29, 1974, at which time the N.L.R.B. presented four witnesses, including the President of Respondent Council called as an adverse party under Rule 43(b), F.R.Civ.P. Subsequently, on June 21st, the N.L.R.B. petitioned this Court for a temporary restraining order pending this Court's decision on its motion for injunction. On June 24th, at the conclusion of the continued hearing for temporary restraining order, this Court denied the request for temporary relief, but granted the injunction sought by the N.L.R.B. Accompanying its order granting the injunction were Findings of Fact and Conclusions of Law which were drafted before the transcript of the May 29th hearing was available. This Opinion sets forth the evidence on which the Findings of Fact were based and the reasoning underlying its Conclusions of Law.

## THE EVIDENCE IN THIS CASE

At the hearing before this Court, Petitioner's witnesses testified as follows:

1. In the early part of this year, the Newark, Delaware, School District embarked upon a project of constructing a new vocational school to be known as the Newark District Vocational School. This school was to be, and is being, erected at a site near the intersections of Routes 896 and 40 in Glasgow, Delaware.

2. Pursuant to contract, Pettinaro Construction Co., Inc. (hereinafter "Pettinaro"), has been engaged by the School District to serve as general contractor on the construction project. Pettinaro is a Delaware Corporation with principal offices located in Wilmington, Delaware.

3. During the past year, Pettinaro has performed services valued in excess of $500,000.00.

4. One of the clients for whom Pettinaro performed services sold goods valued in excess of $50,000.00 outside the State of Delaware.

5. Approximately 50% of the subcontractors whom Pettinaro has engaged to assist it in the construction of the Newark Vocational School employ non-union workers.

6. Respondent Council is an unincorporated association composed of delegates from approximately 18 craft locals in the building and construction industry in the State of Delaware.

7. The officers of the Council are selected by delegates from the local craft unions and the operations of the Council (including the picketing which is the subject of the instant proceeding) are almost wholly financed through a per. capita tax on the member locals.

8. One of the purposes of the Council, as set forth in the Constitution of the Building and Construction Trades Department of the AFL–CIO, which Constitution serves as a guideline for the Council, is "(t)o aid and assist all affiliated National or International unions in securing improved wages, hours and working conditions through the process of collective bargaining."

9. Another of the purposes of the Council, as evidenced by its inauguration of a program known as "Target '74", is to promote the unionization of all construction jobs in the State of Delaware—to work jobs "100% union."

10. The Council maintained a picket line at the Vocational School construc-

tion site on a daily (work-day) basis from April 8, 1974 until June 24, 1974, the date this Court issued an injunction.

11. Neither the Council nor any of its affiliated labor organizations are currently certified as the bargaining representative of Pettinaro's employees.

12. No petition for certification under Section 9(c) of the N.L.R.A., 29 U. S.C. § 9(c), was filed by the Council or any of its constitutent unions.

13. No charge of any unfair labor practice under Section 8(a)(2) of the Act, 29 U.S.C. § 158(a)(2), was filed against Pettinaro by the Council or any of its constitutent unions.

14. The picket line was manned by members of the Council's constitutent craft unions with the Council scheduling and generally supervising picketing operations. The. pickets carried signs which read:

THIS PICKET IS TO ADVISE THE
   PUBLIC THAT THIS PROJECT
   IS BEING BUILT BY NON-UN-
   ION LABOR

Building Trades Council of Delaware

15. Pickets at the construction site had called one of Pettinaro's supervisory employees a "scab."

16. On one occasion, one of the pickets said that "we are on strike against Pettinaro" and that the Council planned to picket until Pettinaro "signed up with the union."

17. The picketing by the Council has resulted in the following problems with deliveries of materials to Pettinaro:

a. The driver of a truckload of cast iron sewer pipe from Cameron, Inc. stopped his truck at the entrance to the jobsite with the result that the pipe was driven onto the jobsite and unloaded by Pettinaro employees;

b. A second truckload of pipe from Cameron, Inc. had to be picked up at a diner about a half mile from the jobsite where the driver had taken it. This pipe was transported from the diner to the jobsite and then unloaded by Pettinaro employees;

c. A truckload of cast iron fittings from Cameron, Inc. was not timely delivered because of the driver's reluctance to either drive onto the site himself or to allow the truck to be driven onto the site by Pettinaro employees;

d. The driver of a truckload of concrete brick from Delaware Block Co. stopped his truck at the entrance to the jobsite with the result that the truck was driven onto the site and unloaded by Pettinaro employees;

e. When "lay-out" lime and rubber hose were not delivered to the jobsite by A. H. Angerstein, Inc., a Pettinaro employee was forced to go to the supplier and pick it up himself;

f. When a truck carrying "grout" (a substance used to prepare leveling plates for the erection of structural steel) stopped at the entrance to the jobsite, Pettinaro employees were forced to transfer the grout into a Pettinaro truck and to then transport the grout onto the site without the assistance of the supplier's driver;

g. On one occasion, a load of concrete was delayed for forty-five minutes because the supplier's driver refused to cross the picket line;

h. On another occasion, in order to avoid the picket line, Pettinaro requested concrete delivery to the jobsite after normal working hours, with resultant overtime expense to Pettinaro. Subsequently, because of delivery problems caused by the picket line, Pettinaro changed concrete materialmen;

i. Once, a supplier of dirt fill who was expected to work the entire day made only one delivery and did not return to the jobsite. During the course of that one delivery, the supplier's drivers had talked to the pickets.[1]

---

1. Incidents a, b, d, f, and g followed a pattern. Pettinaro's expediter testified that he would see the trucks "stopped" at the entrance to the jobsite and see the drivers "talking to the pickets." In those cases where arrangements were made for Pettina-

18. Pettinaro has received no price adjustments from its suppliers on account of the problem deliveries.

One of Pettinaro's employees testified Pettinaro was behind schedule, but that this was mostly a result of bad weather.

There was testimony as to one incident of violence having occurred at the jobsite. A deliveryman testified that he had been "tear-gassed" while leaving the construction site. This witness could not, however, identify his assailants, nor in any way link them to the Council's picketing.

No evidence was presented that the Council or any of its affiliated locals had ever approached Pettinaro to expressly request recognition by, or any kind of agreement from, Pettinaro and no evidence was presented that the Council had ever engaged in any overt efforts to organize any employees of Pettinaro.

## ROLE OF THE COURT IN SECTION 10(*l*) PROCEEDING

Section 10(*l*) of the N.L.R.A. provides, in relevant part:

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of . . . section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith . . . If, after such investigation, the officer or regional attorney to whom the matter may be referred has *reasonable cause* to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court . . . for appropriate injunctive relief pending the final adjudication of the Board with respect

to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems *just and proper*. . . . 29 U.S.C. § 160(*l*) (emphasis added).

Thus, in a Section 10(*l*) proceeding, the district court's function is to determine whether there is *reasonable cause* to believe that a violation of the act had been committed and to administer appropriate relief is such reasonable cause should be found. Schauffler v. Highway Truck Drivers and Helpers, Local 107 (hereinafter Schauffler v. Local 107), 230 F.2d 7, 9 (3rd Cir. 1956). In determining whether reasonable cause exists—i. e., whether there is reasonable cause to believe that all the elements of an unfair labor practice are present, Schauffler v. Local 1291, International Longshoremen's Association (hereinafter Schauffler v. Local 1291), 292 F.2d 182, 187 (3rd Cir. 1961)—the Court need not resolve factual disputes, *id.* at 187, nor decide who should ultimately prevail before the Board, Madden v. International Organization of Masters, Mates and Pilots, Inc., 259 F.2d 312, 313 (7th Cir. 1958), cert. denied, 358 U.S. 909, 79 S. Ct. 236, 3 L.Ed.2d 229 (1958). Those are matters to be decided by the Board, subject, of course, to review in the Courts of Appeals under sections 10(e) and 10(f) of the N.L.R.A. Schauffler v. Local 1291, 292 F.2d at 187. As for the legal theory underlying the Board's charge of unfair labor practice, it need only be shown that it is substantial and nonfrivolous. *Id.*; Samoff v. Building & Construction Trades Council of Philadelphia (hereinafter Samoff v. Philadelphia Council), 475 F.2d 203, 207 (3rd Cir. 1973), vacated and remanded to be

---

ro employees to complete the delivery, the testimony left unclear whether these arrangements were made at the drivers' requests or at Pettinaro's expediter's suggestion. In any event, although Pettinaro's expediter conceded on cross-examination that he was not aware of any instances in which

pickets had actually blocked the path of any approaching trucks, the Court is satisfied the testimony established reasonable cause to believe a cause-and-effect relationship existed between the picketing and the problems with deliveries.

dismissed as moot, 414 U.S. 808, 94 S.Ct. 151, 38 L.Ed.2d 44 (1973). If so, it does not matter whether the district court ultimately agrees with it or not. *Id.*

■ The evidence in this case raises three issues to which the foregoing legal principles must be applied. . (1) Whether Respondent's picketing has a recognitional or organizational objective; (2) whether the picketing is protected by the informational picketing proviso to Section 8(b)(7)(C); and (3) whether a showing of irreparable injury is a prerequisite to a grant of injunctive relief. It is held the Board has presented a substantial and nonfrivolous legal theory and the evidence presented by the Board establishes reasonable cause to believe that facts exist such as would establish an unfair labor practice under the Board's legal theory. It is further held the issuance of the injunction is required upon the Board's establishing there is reasonable cause to believe an unfair labor practice has been committed, without a showing of irreparable injury.

### RECOGNITIONAL OR ORGANIZATIONAL OBJECTIVE

■ Section 8(b)(7)(C) of the N.L.R.A., 29 U.S.C. § 158(b)(7)(C), provides:

It shall be an unfair labor practice for a labor organization or its agents —

\*     \*     \*     \*     \*     \*

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

\*     \*     \*     \*     \*     \*

(C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided,* That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159(c)(1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further,* That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

Since it is conceded the Council has picketed Pettinaro for more than thirty days without filing a petition for certification with the Board, the Board, as a threshold matter, need only demonstrate there exists reasonable cause to believe the purpose of the picketing is to obtain recognition as the bargaining representative of the employer's employees or to obtain acceptance by the employer's employees as their bargaining representative. Samoff v. Philadelphia Council, 475 F.2d at 205. The Board argues the language on the Council's picket signs, taken with the statements by the pickets regarding the purposes of the picketing and in the context of Respondent's overall objectives, including the Target '74 program, establishes the proscribed purpose. Respondent, on the other hand,

relies on its President's denials that its picketing has any such purpose.[2]

Initially, it is noted there was no testimony at the hearing as to whether Pettinaro has any unionizable employees and, if so, what their number is and what functions they perform.[3] The N.L.R.B.'s theory in this case is therefore restricted to one of *recognitional* picketing since no case could be found where picketing was held to be for an organizational purpose in the factual context of a picketed employer with no employees.

The evidence adduced by the N.L.R.B. reasonably admits of three different (although not mutually incompatible) inferences regarding the purpose of the Council's picketing. One possible inference is that Council by its picketing hoped to force Pettinaro to cancel its contracts with non-union subs with regard to the Newark Vocational School project and to replace the non-union subs with union subs. Since no charge of any unfair labor practice under Section 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B), has been presented to this Court, this possibility need be explored no further.

The second possible motive for Council's picketing is that Council's aim is to force Pettinaro to deal with union subcontractors only, either by virtue of a subcontractor's agreement or, without such an agreement, through fear of renewed picketing by the Council at future jobsites. The N.L.R.B. chose not to pursue this theory before this Court.[4]

A third inference that could be drawn from the evidence regarding the motive for the Council's picketing is that the Council is seeking to force or require Pettinaro to bargain with it or one or more of its constituent craft unions over the subject of the non-unionized aspects of Pettinaro construction jobs. The Board, relying upon Local 542, Int'l. Union of Oper. Engineers (R. S. Noonan, Inc.) (hereinafter the *"Noonan"* case), 142 N.L.R.B. 1132 (1963), enforced sub nom. N.L.R.B. v. Local 542, Int'l. Union of Oper. Engineers, 331 F.2d 99 (3rd Cir. 1964), cert. denied 379 U.S. 889, 85 S.Ct. 161, 13 L.Ed.2d 93, argues that such a purpose can be characterized as one of recognition, even where the picketed employer does not, on the present record, employ any workers of the type the picketing labor organization normally represents.

The Court reads *Noonan* as holding a labor organization's picketing can violate Section 8(b)(7)(C), even though the picketed employer has no employees. Since Section 8(b)(7)(C) envisions settling of questions of representation through Board-conducted orderly elections, one necessarily has difficulty perceiving how there can be a petition for an election where there are no employees who can vote in such election. Notwithstanding the Court's conceptual dif-

---

2. The Council's President, Mr. Ryan, asserted that the Council does not represent the employees of any employer for collective bargaining purposes. Mr. Ryan repeatedly stated that the picketing was "for informational purposes only." He explained that the function of the picketing was to inform the public of the non-union nature of the job so that in the future "maybe more jobs (would go) union."

3. The complaint filed by the charging party with the N.L.R.B. and submitted by the N.L.R.B. with its initial pleading before this Court states the number of Pettinaro's employees to be 80, but makes no further specification. When the deficiency in the record was drawn to the N.L.R.B.'s attention, it declined to reopen the record and insisted that the existence or non-existence of Pettinaro employees was immaterial to its theory of the case.

4. In a case where a subcontractor's agreement was expressly sought by a Trades Council, the N.L.R.B. held that the picketing was for a recognitional purpose. *See* Bldg. and Constr. Trades Council of Philadelphia *(Samuel Long, Inc.)* (hereinafter the *"Sam Long"* case), 201 N.L.R.B. No. 42 (1973), *enforced,* 85 L.R.R.M. 2187 (3rd Cir. 1973). The legal theory of that case presupposed that the picketed employer had employees whose bargaining position, vis-a-vis the employer, could be adversely affected by the employer's signing a subcontracting agreement with an entity which was not their bargaining representative. *See* 201 N.L.R.B. No. 42, Administrative Law Judge's Decision at 5–9.

ficulties and the obvious factual differences between this case and *Noonan*,[5] this Court is duty bound to follow *Noonan*. In discharging its duty, this Court must hold the Board's theory that Respondent's picketing has a recognitional objective is substantial and nonfrivolous even though the picketed employer has no employees.[6] Accordingly, this Court holds that, for purposes of this proceeding, the Board has satisfied the introductory language to Section 8(b)(7).

## INFORMATIONAL PICKETING PROVISO

The Council contends even if its picketing had a recognitional objective, it falls within the so-called "informational" picketing proviso to section 8(b)(7)(C) in that its picketing efforts are restricted to "truthfully advising the public . . . that an employer does not employ members of, or have a contract with, a labor organization. . . ." 29 U.S.C. § 158(b)(7)(C). The N.L.R. B. argues the Council's signs are not truthful because not all of Pettinaro's subcontractors are non-union and that even if the signs are truthful, Council's picketing falls within the exception to the proviso condemning "informational picketing" where "an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services." 29 U.S.C. § 158(b)(7)(C).

The N.L.R.B.'s legal theory that the Council's picket signs are untruthful borders upon being frivolous and insubstantial. Where the picketing union used the words "non-union" on its signs even though some of the employer's employees were represented by unions, the National Labor Relations Board has held the language to be truthful. *See* Retail Clerks Local 324 (Barker Bros. Corp.) (hereinafter *Barker Bros.*), 138 N.L.R. B. 478, 486 n. 15 (1962), affirmed sub nom. Barker Bros. Corp. v. N.L.R.B., 328 F.2d 431 (9th Cir. 1964).

However, the N.L.R.B.'s theory that there is reasonable cause to believe that Council's picketing has caused an "effect" proscribed by the exception clause to the proviso cannot be characterized as frivolous and insubstantial. In the *Barker Bros.* case, the Board set forth the standard for determining whether such an effect had occurred. Eschewing any quantitative test based on counting members of refusals to deliver or perform services, the Board held that the proper standard was the "actual impact" on the picketed employer's business. 138 N.L.R.B. at 491. "That is," the Board said, "the presence or absence of a violation will depend upon whether the picketing has disrupted, interfered with, or curtailed the employer's business." *Id.*

In *Barker Bros.*, the Board held that no such effect had occurred where "there were only 3 delivery stoppages, 2 work delays, and several delivery delays"

---

5. In *Noonan*, the labor organization involved was a *local* and not a trades council and had had prior collective bargaining agreements with the picketed employer. 331 F.2d at 100. In addition, there was clear evidence in *Noonan* that the union had *expressly* requested the employer to sign a collective bargaining agreement. *Id.*

6. In reaching this conclusion, the Court notes the present case is more tenuous on the facts than the cases, Joint Bd. of Culinary Workers (Jack-in-the-Box), 203 N.L.R.B. No. 114 (1973) and Joint Exec. Bd. of Hotel and Restaurant Employees (Crown Cafeteria), 135 N.L.R.B. 1183 (1962), enforced sub nom. Smitley v. N. L. R. B., 327

F.2d 351 (9th Cir. 1964), cited by the N.L.R.B. as controlling. In both of those cases, the picketing was being done by *local unions*, as well as by the Joint Boards. Moreover, the trial examiner in the *Crown Cafeteria* case expressly noted that the constitution under which the involved locals operated required all collective bargaining agreements to be signed by the Joint Executive Board. Joint Exec. Bd. of Hotel and Restaurant Employees (Crown Cafeteria), 130 N.L.R.B. 570, 579 (1961). In the present case, there is no evidence that the Council has any history of signing collective bargaining agreements or is under any organizational compulsion to do so.

and where, in addition, "the record (was) virtually silent as to not only the nature and quantity of the products that failed to reach their destination, but also the impact of the stoppage and/or delays on the Employer's business." *Id.* at 491–92. In a later case, Retail Clerks Local 1404 (Jay Jacobs Downtown, Inc.), 140 N.L.R.B. 1344 (1963), the N.L.R.B. held no "effect" had occurred where the picketing of a women's apparel shop had resulted in refusals to install mirrors, to deliver light bulbs and clothing tags, and where minor delays were experienced in the installation of floor tiles, in the repair of a stair tread and in the completion of some "outside work." Lebus v. Bldg. and Constr. Trades Council, 199 F.Supp. 628 (E.D.La.1961), relied on by the Council, held there was no "effect" where the interruptions of construction work were "isolated," did not affect the progress of the work, and where the supplies, through one method or another, were all eventually received at the jobsite. *Id.* 629, 630, 633.

Both the *Barker Bros.* and *Jay Jacobs* cases are distinguishable in that they involved the picketing of retail stores—not public construction projects. There is language in both cases from which the inference may be drawn that the rule stated in those cases is limited to situations involving the picketing of retail establishments. *See* 138 N.L.R.B. at 491; 140 N.L.R.B. at 1346. While *Lebus* is factually like the instant case, the Court declines to follow it because it requires a showing of an intent to disrupt before the "effect" clause could be triggered, 199 F.Supp. at 633–634, 634. Intent to disrupt is not found in the statute nor the great majority of cases.

Finally, the *Jack-in-the-Box* case, relied on by the Board, held that an "effect" had occurred where the picketing of the restaurant had only resulted in deliveryman making offsite deliveries of bread and dairy products and also of coffee (for periods of 52 and 22 days, respectively). 203 N.L.R.B. No. 114 (slip opinion) (1973), at 3. *Jack-in-the-Box* indicates disaster need not befall a picketed employer before an "effect" has occurred.

The determination of whether there is reasonable cause to believe that the interruptions of deliveries of materials to Pettinaro, with the attendant increase in construction costs, constitute an "effect" within the meaning of the qualifying clause to the informational picketing proviso, while it includes factual elements, is essentially a legal question which should first be decided by the Board, who have greater expertise in labor matters and are therefore in a better position to decide just what constitutes a "disruption," "interference with" or "curtailment" of a particular type of business operation.

■ The Court cannot say the N.L.R.B.'s legal theory is frivolous and not substantial when it contends that a "disruption" of a construction job has occurred where the general contractor's own employees have been forced, on more than one occasion, to leave the jobsite to pick up and then to deliver and unload critical material at no adjustment in cost to the general contractor; where the general contractor has been forced to put workers on overtime in order to accomplish a delivery of concrete; where the general has been forced to find a new materialman for concrete work, and where the delivery of dirt fill was held up for at least a day. Accordingly, this Court finds, without expressing any opinion on the ultimate outcome before the Board, that Petitioner had reasonable cause to believe that Respondent's picketing had an affect on inducing individuals to not deliver goods and to not perform services and, thus, reasonable cause to believe that the "informational picketing" proviso was inapplicable.

## APPROPRIATENESS OF INJUNCTIVE RELIEF

■ On the question of the appropriate standard for the granting of injunctive relief, section 10(1) provides:

"Upon the filing of [the N.L.R.B.'s petition for an injunction] the district

court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper . . ."

29 U.S.C. § 160(*l*). Respondent Trade Council argues that a proper interpretation of the words "just and proper" requires more than a mere showing of reasonable cause to believe that an unfair labor practice has been committed before the district court can grant injunctive relief. In support of this position, Council cites Minnesota Mining and Manufacturing Co. v. Meter, 385 F.2d 265 (8th Cir. 1967). In *Minnesota Mining,* the Eighth Circuit reversed a district court's granting of a temporary injunction under section 10(j) of the Act, even though upholding the district court's finding that there was reasonable cause to believe that an unfair labor practice had been committed. 385 F.2d at 273. After quoting from the legislative history of section 10(j), the Court stated:

"In our view, as suggested by the quoted excerpt from the Senate Report, the district judge's discretion in granting temporary relief under Section 10(j) cannot be activated and motivated solely by a finding of 'reasonable cause' to believe that a violation of the Act has occurred. More is required to guide his permissive range of discretion. Section 10(j) is reserved for a more serious and extraordinary set of circumstances where the unfair labor practices, unless contained, would have an adverse and deleterious effect on the rights of the aggrieved party which could not be remedied through the normal Board channels. In determining the propriety of injunctive relief the district court should be able to conclude with reasonable probability from the circumstances of each case that the remedial purpose of the Act would be frustrated unless immediate action is taken . . ." 385 F.2d at 270.

*Minnesota Mining,* establishing standards for injunctive relief under section 10(j) as distinguished from section 10(*l*), is not controlling. In a proviso to section 10(*l*), Congress specifically provided that the standard of substantial and irreparable injury should be used in ex parte T.R.O. proceedings. 29 U.S.C. § 160(*l*). This provision constitutes the only reference to substantial and irreparable injury in that statutory section. When describing the standard to be used in granting relief in other than ex parte T.R.O. proceedings, Congress used different language—"just and proper." The choice of such language fairly indicates that Congress did not wish the availability of interim injunctive relief under section 10(*l*) to be conditioned upon the satisfaction of traditional equity criteria. The different standard which Congress had in mind is set forth in Schauffler v. Local 1291, Int'l Longshoremen's Ass'n, 292 F.2d 182 (3rd Cir. 1961). In that case, the Third Circuit upheld the district court's granting of a section 10(*l*) injunction, *see* Schauffler v. Local 1291, Int'l Longshoremen's Ass'n, 188 F.Supp. 203 (E. D.Pa.1960), upon the "mere" showing that there was reasonable cause to believe that an unfair labor practice had been committed. In the course of its opinion, the Third Circuit stated its interpretation of the legislative history of section 10(*l*):

"The Section 10(*l*) procedure reflects the congressional determination that certain unfair labor practices are so disruptive that *where there is reasonable cause to believe that they are being engaged in* their continuance during the pendency of charges before the Board should not be permitted."

292 F.2d at 187 (citation omitted, emphasis added). The apparent rationale for this position, and the reason this position differs from that expressed by the Eighth Circuit in the *Minnesota Mining* case is found in the statutory scheme set forth in sections 10(j) and

10(*l*).[7] Section 10(j) *empowers* the N.L.R.B. to seek injunctions against unfair labor practices of all types; section 10(*l*) makes petitioning for injunctive relief *mandatory* for the N.L.R.B. in the case of certain unfair labor practices,[8] among which section 8(b)(7)(C) practices are numbered. In addition, in section 10(*l*) Congress made the investigation of section 8(b)(7)(C) unfair labor practices top priority items for the Board. This special sense of urgency reflected in the top-priority-investigation and mandatory-petition-for-injunction provisions spills over, so the Third Circuit has held, into the standard—"just and proper"—for granting injunctive relief as well. In the words of the district court in Schauffler v. Local 1291:

"Section 10(*l*) of the Act embodies the determination of Congress that even the threatened disruption of commerce by acts and conduct proscribed by Section 8(b)(4)(i)(ii)(D) is unjustified and inimical to the national interest. In that section, therefore, Congress imposed a mandatory duty upon the Board's officer or regional attorney to whom the matter is referred to seek injunctive relief in the appropriate district court upon a reasonable belief that a violation has occurred and empowered the court petitioned to grant the injunctive relief deemed 'just and proper.' The legislative history of the Act shows that Congress intended such power to be exercised by the court in aid of the 'prompt elimination of the obstructions to the free flow of commerce' which the relatively slow procedures before the Board had failed to achieve." 188 F.Supp. at 210–211 (footnote omitted).

*See* Samoff v. Philadelphia Council, 475 F.2d at 206–207. Under circumstances such as those in the present case:

"   . . .   the propriety of injunctive relief in Section 10(*l*) cases turns not upon traditional equity criteria applicable in suits between private parties, but upon the necessity of effectuating the statutory policy, Hecht Co. v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754. It is well settled that where Congress sets the standards for the issuance of injunctions, those standards, and no others, need be satisfied to sustain the prayer for injunctive relief." Schauffler v. Local 1291, 188 F.Supp. at 211.

Here, the evidence gives every reason to believe, and no reason to doubt, that, if left unenjoined, Respondent Council's activities, which there is reasonable cause to believe constitute unfair labor practices, will continue.

## AMENDMENT TO FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

The Court having, on June 24, 1974, issued initial Findings of Fact, Conclusions of Law and an Order in the above-captioned matter and now having had benefit of the transcript of the hearing held in this matter on May 29, 1974 and further argument of counsel, hereby amends its initial Findings of Fact, Conclusions of Law, and Order, as follows:

### FINDINGS OF FACT

1. *Finding of Fact* 4(c) is deleted and substituted in its place is the following:

4. (c) During the past year, Pettinaro has provided services and goods valued in excess of $500,000.00, in-

---

7. Respondent, in its memorandum of law, took the position that section 10(j) and 10(*l*) proceedings were functionally equivalent. This contention has been unsuccessfully argued in the past. *See* Danielson v. Local 275, Laborers' Int'l. Union, 479 F.2d 1033, 1035 n. 2 (2d Cir. 1973), reversing

Danielson v. Local 323, United Bhd. of Carpenters, 357 F.Supp. 1178 (S.D.N.Y.1973).

8. Provided, investigation reveals reasonable cause to believe that an unfair labor practice has been committed.

cluding services in excess of $50,000.-00 to one client who sells goods and services valued in excess of $50,000.00 outide the State of Delaware.

2. The Court hereby makes the following further Finding of Fact:

4. (r) The picketing of respondent, occurring in connection with the operations of Pettinaro, has a close and substantial relation to trade, traffic and commerce among the several states and tends to lead to, and does lead to, labor disputes burdening and obstructing the free flow of commerce.

## CONCLUSIONS OF LAW

1. Initial *Conclusion of Law* number 1 is renumbered 1(a) and further *Conclusions of Law* 1(b) and 1(c) are added as follows:

1. (b) For purposes of this proceeding, Respondent is a labor organization within the meaning of Sections 2(5) and 8(b) of the Act.

1. (c) Pettinaro Construction Co. is engaged in commerce within the meaning of Section 2(6) of the Act.

2. Initial *Conclusion of Law* number 4 is deleted and the following substituted therefor:

4. Petitioner has reasonable cause to believe that Respondent has, since early April, 1974, continuously engaged in an unfair labor practice under Section 8(b)(7)(C) of the Act, affecting commerce within the meaning of Section 2(7) of the Act.

## ORDER

The Order dated June 24, 1974, is hereby amended to read as follows:

This case came to be heard upon the verified petition of Bernard Samoff, Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of said Board, praying for a temporary injunction pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, pending the final disposition of the matters involved pending before said Board, and upon the issuance of an order to show cause why injunctive relief should not be granted as prayed in said petition. The Court, upon consideration of the pleadings, evidence, brief, arguments of counsel and the entire record in the case, finds and concludes that Petitioner has reasonable cause to believe that Respondent has engaged in, and is engaging in, acts and conduct in violation of Section 8(b)(7), subparagraph (C), of said Act, affecting commerce within the meaning of Section 2(6) and (7) of said Act, and that such acts and conduct will likely be repeated or continued unless enjoined.

Therefore, upon the entire record, it is

Ordered, adjudged and decreed that, pending the final disposition of the matters herein involved which are now before the National Labor Relations Board, Respondent, Building and Construction Trades Council of Delaware, its officers, representatives, agents, servants, employees, and all members and persons acting in concert or participation with it or them, be, and they hereby are, enjoined and restrained from:

(a) Continuing to picket Pettinaro Construction Co., Inc., at the construction site of the Newark District Vocational School, Glasgow, Delaware.

(b) Otherwise picketing or causing Pettinaro Construction Co., Inc., to be picketed where an object thereof is to force or require Pettinaro Construction Co., Inc., to recognize or bargain with Respondent or any other labor organization, as the representative of employees of Pettinaro Construction Co., Inc., unless and until Respondent, or such other labor organization, is certified as the representative of such employees pursuant to the provisions of Section 9 of the Act.