Leonard **LEVENTHAL**, Acting Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

**BUILDING AND CONSTRUCTION TRADES COUNCIL OF DELAWARE and Local Union 313, International Brotherhood of Electrical Workers, Respondents.**

Civ. A. No. 74–152.

United States District Court, D. Delaware.

Oct. 17, 1974.

Peter G. Nash, Gen. Counsel, Allen Baron Roberts, Atty., N. L. R. B., Philadelphia, Pa., for petitioner.

Harvey B. Rubenstein, Wilmington, Del., for respondent.

Thomas E. Waters, Jr., Norristown, Pa., for Charging Party.

MURRAY M. SCHWARTZ, District Judge.

This proceeding arises under Section 10(*l*) of the National Labor Relations Act (N.L.R.A.), as amended, 29 U.S.C. § 160(*l*) (1970).

On June 24, 1974, the Court enjoined the Building and Construction Trades Council of Delaware (Council), a respondent in a National Labor Relations Board (Board) Section 10(*l*) injunction proceeding, 29 U.S.C. § 160(*l*) (1970), from picketing, *inter alia,* of Pettinaro Construction Co., Inc. (Pettinaro) at the construction site of the Newark District Vocational School at Glasgow, Delaware. The day following entry of the Court's injunction, Local 313 of the International Brotherhood of Electrical Workers (Local 313) established an organization-al picket line at the Pettinaro site, seeking to organize Pettinaro's electrical subcontractor, Wyman Electrical Service Co. (Wyman).

On June 28th a Section 8(b)(7)(C), 29 U.S.C. § 158(b)(7)(C) (1970) unfair labor charge was filed with the Board against Local 313. On July 9, 1974, a charge was filed with the Board wherein Pettinaro was named as the employer charging the Council and Local 313 with engaging in unfair labor practices under Section 8(b)(4)(i) and (ii)(B), 29 U.S. C. § 158(b)(4)(i), (ii)(B) (1970). On June 10, 1974, the Board moved this Court under Section 10(*l*), 29 U.S.C. § 160(*l*) (1970) for an injunction relating to the alleged Section 8(b)(7)(C), 29 U.S.C. § 158(b)(7)(C) (1970), violation with Local 313 being named as the respondent. On July 19, 1974, the Board moved this Court for an injunction against the picketing pending final disposition of the Section 8(b)(4)(i), (ii)(B), 29 U.S.C. § 158(b)(4)(i), (ii)(B) (1970) unfair labor practice charge wherein the Council and Local 313 were named as respondents. The Board's two petitions for injunction under Section 10(*l*), both having arisen out of the Pettinaro construction project of the Newark District Vocational School located in Glasgow, Delaware, were consolidated for hearing which was held on August 1, 2 and 5, 1974.

On August 8, 1974, the Court entered Findings of Fact and Conclusions of Law and granted the injunction sought by the Board on the 8(b)(4)(i), (ii)(B), 29 U.S.C. § 158(b)(4)(i), (ii)(B) (1970), as against Local 313. Subsequent to the issuance of the injunction against Local 313, that union and the Board settled their differences, having entered into a consent decree, making unnecessary any discussion or decision on the 8(b)(7)(C), 29 U.S.C. § 158(b)(7)(C) (1970), unfair labor practice charge leveled against Local 313. This opinion, written before the transcript of the hearing is available, sets forth the evidence on which the Findings of Fact were based, as that evi-

dence relates to a determination of the remaining 8(b)(4)(i), (ii)(B), 29 U.S. C. § 158(b)(4)(i), (ii)(B) (1970) unfair labor practice charge against the Council.

In the early part of 1974, Pettinaro, a general non-union contractor, entered into a contract to build the Newark District Vocational School located at Glasgow, Delaware. The award of the bid to Pettinaro caused consternation [1] to Respondent, Council, an unincorporated association composed of delegates from approximately eighteen craft locals of the building and construction industry in Delaware.

Respondent, Local 313, is a constituent craft local of the Council, with its Business Manager and Assistant Business Manager both being delegates to the Council and with the Assistant Business Manager being Council Secretary.

The Council, on behalf of its affiliated craft locals, endeavors to increase job opportunities of craft union members, intervenes in intra-Council jurisdictional disputes between affiliates, participates in pre-job conferences, becomes a signa-

---

[1]. Examples of the deep feeling and comment caused by the Newark District Vocational School job are the following excerpts from reports of the Council President given at Council meetings:

"Now, I guess the most important thing . . . that should be brought up is the fact that we have just lost a job to a non-union general contractor which is so large that there aren't any non-union generals that could get such a job. That, of course, is the Newark Vocational High School. The low bidder was the Pettinaro Company, with a bid of $7,790,000. Rupert Construction was $7,924,000., a difference of only $134,000. That job could possibly be ours if ten (10) union contractors hadn't bid to Pettinaro—or—if Rupert Construction Co. could have been allowed to use maybe 5 non-union bids. If Pettinaro does this job, and uses those union contractors, then you can say goodby to union general contractors and the eventual end to union subs, which then means the eventual end to union hiring halls, and you could carry your union card around in your pocket as a memento of something that used to represent strength. Or, we could all remember that we had agreed when we started 'Target 74' that we know we can't depend on our contractors whether they be a general [sic] or subs, and that this is our battle, and say to those union subs that bid to Pettinaro, shame on you, you got the job, now do it, but without me. Also, we don't need any floor fight here tonight between crafts because it's not the crafts problems, it's the union subs that have the job. Let them come to us for once, and maybe we can get our point over to them. . . ." Minutes of the Building and Construction Trades Council of Delaware, February 7, 1974—President's Report.

"The non-union contractors are getting bigger and bigger, and we're having more and more unemployment, but we continue to do nothing about it. The union subcontractors continue to bid to the non-union general contractors, because they know that we'll continue to work on any job they get. The union general contractors now number about six, and we're about ready to lose a couple of them unless we can help them to be competitive, and that is to work 100% union. As individual locals, we seem to be satisfied to work open shop in the State of Delaware, up until the time when our craft doesn't get the job. We can prove that we're going to be 100% union by staying off any job that isn't being built 100% union.—We will be picketing the Newark Vocational School job on Rte. 896, at Glasgow, starting April 8, 1974, using informational picket signs. It was decided by the Board of Business Agents that each local that belongs to this Building Trades Council will supply pickets on a per capita paying basis. The following procedure for picketing will be used: There will be six pickets per day, with a Business Agent each day to be at the picket site to oversee the picketing. There will be 3 or 4 locals represented by pickets every day. A schedule is worked out that will say which locals and how many men from each local will be picketing on each day. Using six men per day, and using all the men required from each local on a per capita basis, we will be able to picket for twelve days, and then we will start from the beginning of the schedule all over again. This means that except for those locals that have less than 50 members, we could picket this job for 2 years without ever using any member for picket duty more than one day.—In the past month we have lost three jobs to the non-union general contractor. . . ." Minutes of Building and Construction Trades Council of Delaware, April 4, 1974. —President's Report.

tory to project agreements, and supports legislation favorable to affiliated locals. Another of the purposes of the Council, as evidenced by its inauguration of a program known as "Target 74", is to promote the unionization of all construction jobs in the State of Delaware—to work jobs "100% union."

Perceiving "Target 74" to be jeopardized by the contract award to Pettinaro, a special six man committee was formed by the Council to examine alternative courses of action which might be available. That committee, which contained both the President of the Council and the Business Manager of Local 313, concluded the Council should engage in what it considered to be informational picketing at the construction site.

On April 8, 1974, the Council commenced picketing. The six man picket line was manned by members of the Council's constituent craft unions with the Council scheduling and generally supervising picketing operations. The pickets carried signs which read:

THIS PICKET IS TO ADVISE THE PUBLIC THAT THIS PROJECT IS BEING BUILT BY NON–UNION LABOR

The Building Trades Council of Delaware.

Local 313 furnished two of the six pickets on April 15, 17, 18, and 19; May 1, 3, 6, 7, 17, 21, 22, and 23; June 5, 7, 10, 12, and 21 and a picket captain on April 15, May 1 and 17, and June 5 and 21. The Council picketing was terminated by injunction issued by this Court on June 24, 1974.[2]

2. See related opinion, Samoff v. Building and Construction Trades Council of Delaware, 378 F.Supp. 261 (D.Del.1974).

3. Credible uncontradicted testimony is that the Assistant Business Manager of Local 313 contacted the President of Wyman in 1971 and in February, 1974. At the latter meeting the Assistant Business Manager referenced the Newark District Vocational School job and again requested recognition and bar-

The Business Managers of Local 313 reacted to the injunction by determining to implement an organizational effort previously under active consideration[3] by posting an organizational picket line at the construction site. On June 25, 1974, Local 313 pickets appeared at the site carrying placards bearing the legend:

Atty—655–7421

L.U. 313 IBEW Is Organizing The Employees of Wyman Electric Company And Seeks NLRB Certification

Local 313 picketed the Newark District Vocational School construction site each work day until enjoined by this Court on August 8, 1974.

On June 25, 1974, Wyman Electrical Service employed approximately 20 electricians. No more than four Wyman electricians ever worked at the Glasgow job. Those four Wyman employees were not spoken to by the Local 313 pickets, nor offered organization cards. During the time Local 313 picketed the Glasgow site, Wyman had jobs at five other locations. Local 313 picketed none of the other jobs but for one day by one picket at one of the other sites, nor did it picket Wyman's office where presumably all electricians reported for work.

The continuous picketing since April 8th has taken its toll on both Pettinaro and Wyman. A Pettinaro employee who testified at an earlier hearing that the project was behind schedule primarily because of adverse weather, stated the project was far behind a projected progress schedule because of the picketing. From the testimony, it was clear steel

gaining. On or about June 19th, the Local 313 Business Manager dictated a letter scheduling a meeting of Wyman employees for June 25th. However, the letter was not sent because he failed to instruct his secretary as to the time of the meeting. That meeting was subsequently held on July 1st pursuant to a retyped notice dated June 25th. A petition for election was mailed to the National Labor Relations Board on June 23, 1974.

could not be erected because the Operating Engineers would not bring a needed crane onto the construction site through a gate used primarily by union subcontractors so long as Local 313 pickets maintained their vigil at the area of the gate [4] used by nonunion subcontractors. On July 24th, two days prior to a second refusal of the Operating Engineers to enter onto the construction job, Pettinaro caused a letter to be hand-delivered to the Council and Local 313 advising as follows:

> Effective immediately, Wyman Electrical Service, their employees, sub contractors and suppliers are removed from the above referenced job site for an indefinite period.

Wyman employees were not at the Glasgow site subsequent to July 24th. Local 313 continued to picket assertedly because of the vague wording of the July 24th Pettinaro letter and the fact that Wyman left its trailer, tools and supplies on the job.

The continuous picketing since April 8th has caused a diverting of shipments of Wyman supplies which would normally have been delivered on site to Wyman and Pettinaro warehouses, resulting in uncompensated reconsignment and handling charges estimated by Wyman to be approximately $10,000. The method of presentation of the evidence precludes any finding with respect to Wyman which would apportion Wyman's damages between pre-June 25th picketing (Council picketing) and post-June 25th picketing (Local 313 picketing).

The role of this Court in a 10(*l*) proceeding, 29 U.S.C. § 160(*l*) (1970), has recently been articulated:

> [I]n a Section 10(*l*) proceeding, the district court's function is to determine whether there is *reasonable* cause to believe that a violation of the act had been committed and to administer appropriate relief is such rea-

sonable cause should be found. Schauffler v. Highway Truck Drivers and Helpers, Local 107 (hereinafter Schauffler v. Local 107), 230 F.2d 7, 9 (3rd Cir. 1956). In determining whether reasonable cause exists—i. e., whether there is reasonable cause to believe that all the elements of an unfair labor practice are present, Schauffler v. Local 1291, International Longshoremen's Association (hereinafter Schauffler v. Local 1291), 292 F.2d 182, 187 (3rd Cir. 1961)—the Court need not resolve factual disputes, *id.* at 187, nor decide who should ultimately prevail before the Board, Madden v. International Organization of Masters, Mates and Pilots [of America], Inc., 259 F.2d 312, 313 (7th Cir. 1958), cert. denied [358 U.S. 909], 79 S.Ct. 236 [3 L.Ed.2d 229] (1958). Those are matters to be decided by the Board, subject, of course, to review in the Courts of Appeals under sections 10(e) and 10(f) of the N.L.R.A. Schauffler v. Local 1291, 292 F.2d at 187. As for the legal theory underlying the Board's charge of unfair labor practice, it need only be shown that it is substantial and nonfrivolous. *Id.*; Samoff v. Building & Construction Trades Council of Philadelphia (hereinafter Samoff v. Philadelphia Council), 475 F.2d 203, 207 (3rd Cir. 1973), vacated and remanded to be dismissed as moot, 414 U.S. 808, [94 S.Ct. 151, 38 L.Ed.2d 44] (1973). If so, it does not matter whether the district court ultimately agrees with it or not. *Id.* Samoff v. Building and Construction Trades Council of Delaware, [378] F.Supp. [261] (D.Del.1974).

The Court must apply the above quoted legal principles to the evidence to ascertain whether there has been a showing of the requisite reasonable cause to believe the Council violated the Act in the manner charged by the Board. The Board vigorously urges that the Council

---

4. The Local 313 pickets were patrolling an area from the "non-union" gate extending northward in a straight line to a point somewhere between one-third and the halfway point toward the gate the Operating Engineers refused to enter.

and Local 313 were acting as agents for each other and, as a consequence, the picketing for an unlawful objective by Local 313 was an act attributable to the Council. In support of its position, it emphasizes that the Assistant Business Manager of Local 313 was the unpaid Secretary of the Council and, furthermore, that the Business Manager of Local 313 and the President of the Council served on the special Council committee which determined to engage in the alleged informational picketing subsequently enjoined by this Court as unlawful. The Board also points to many of the facts which caused this Court to conclude that while the picketing by Local 313 had a lawful organizational objective, there was also reasonable cause to believe that a picketing objective was to enmesh a neutral Pettinaro in Local 313's organizational campaign of Wyman so as to bring economic pressure on Pettinaro to achieve *Council's* "Target 74" goals. Illustrative examples are the exquisite timing of the Local 313 decision to engage in organizational picketing, the presence of the Local 313 organizational picket line the day following issuance of the injunction restraining Council picketing, mutual interest in attainment of "Target 74" goals, failure to picket Wyman's office and almost non-existent picketing at other Wyman sites.

The Board's argument would have appeal but for the fact that the Court's recollection of the testimony is that the record will prove to be absolutely barren of any fact or reasonable inference that would tend to show an agency relationship between Council and Local 313 with respect to the post-June 24th picketing of Local 313 of the Newark District Vocational School site. The Council through its President was neither informed nor consulted prior to the Local 313 decision to picket. When the Council President learned of the Local 313 decision, he advised Local 313 of the injunction and suggested it contact legal counsel. While attending the meeting of the Local 313 Business Manager with counsel by invitation, the Council's President was summarily dismissed, presumably because of the language of the injunction. Unlike the pre-June 25th picketing, the Council had no connection, or knowledge, much less responsibility, for supervising, scheduling and placing of the Local 313 pickets.

■ The President of the Council, the Assistant Business Manager of Local 313, and the Business Manager of Local 313 were in uniform agreement that the Local 313 decision to picket and actual picketing were acts done without inclusion of the Council. The Local 313 unilateral determination to pursue the Council's "Target 74" goal without any participation, assistance, or knowledge in advance by the Council and the lack of evidence of a common plan or concerted action precludes any finding that the Board has reasonable cause to believe Local 313 was acting as an "agent" for the Council when it picketed the Pettinaro site commencing June 25, 1974, until enjoined.

The only evidence in the record is that Local 313 acted independently of, and unaided by, the Council. For that reason, the four "agency" cases cited by the Board, Wyoming Valley Building & Construction Trades Council (Altemose Construction Associates), 211 N.L.R.B. No. 154 (1974), General Teamsters Union Local No. 126 (Ready Mixed Concrete, Inc.,), 200 N.L.R.B. No. 41 (1972), United Brotherhood of Carpenters and Joiners, Local No. 1818 (N. C. Monroe Construction Co.), 181 N.L.R.B. No. 12 (1970), and Modern v. Building Trades Council of New Haven, 55 L.R.R.M. 2589 (D.Conn.1964), have no application. In *Ready Mixed Concrete, supra,* unauthorized picketing was done by Business Agents of the locals, with the agency issue being whether the locals committed unfair labor practices by reason of the unauthorized picketing of its Business Agents. In *N. C. Monroe Construction Co., Inc., supra,* the Board again held the local responsible for the unfair labor practice of its Business Agent where the local asserted as a defense that its Business Agent was acting for a District

Council rather than the local. *Altemose Construction Associates, supra,* and *Modern v. Building Trades Council, supra,* involved picketing by the Council, not the local. However, language in the latter is worth noting because facts were present there to reasonably support an agency theory. So, too, were such facts present in an earlier related case in this Court, but no agency theory was pursued then by the Board.[5] Such facts are absent in the instant matter:

> Respondent New Haven Trades Council raises a separate point. it argues that there is insufficient evidence to support a finding that the Building Council is the agent of the respondent locals and that, therefore, the Council is not subject to the prohibitions of 8(b)(4). In view of the fact that the actions of the Council here complained of are in furtherance of the interests of the member unions and were decided upon and authorized by the member unions through their delegates, there is reasonable cause to believe that the Building Council is acting for and on behalf of the respondent locals. Modern v. Building Trades Council of New Haven, 55 L. R.R.M. 2589, 2591 (D.Conn.1964).

■ In order to find the Board had reasonable cause to believe the Council committed an unfair labor practice by reason of the picketing of Local 313 on the facts presented, the Board must formulate and present some legal theory which permits imposition of responsibility on the Council for the independent, separate, distinct acts of its craft locals over which the Council has no control. The inability to formulate such a theory is what perhaps caused the Board to pursue the Council under the "reasonable cause" formulation for relief in the form of a 10(*l*) injunction, 29 U.S.C. § 160(*l*) (1970), rather than undergo a more stringent proof burden by proceeding against the Council by way of contempt for violation of this Court's June 24, 1974 restraining order.

The Board's agency theory, when applied to the facts addressed in support of the unfair labor practice charge, must be characterized as "insubstantial and frivolous." Samoff v. Building and Construction Trades Council of Philadelphia, 475 F.2d 203, 207 (3rd Cir. 1973).

### ORDER

The application of Leonard Leventhal, Acting Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, for an injunction against the Building and Construction Trades Council of Delaware, filed on June 19, 1974, is denied.

---

5. The argument of the Board would have had substantial appeal in earlier litigation arising out of picketing by the Council. The Court would have had little or no trouble concluding there was reasonable cause to believe there was an agency relationship between the Council and its constituent craft locals in relation to Council picketing at the Pettinaro site. The Court in Samoff v. Building and Construction Trades Council of Delaware, 378 F.Supp. 261 (D.Del.1974), at 267 stated:

> The evidence adduced by the N.L.R.B. reasonably admits of . . . different (although not mutually incompatible) inferences regarding the purpose of the Council's picketing. One possible inference is that Council by its picketing hoped to force Pettinaro to cancel its contracts with non-union subs with regard to the Newark Vocational School project and to replace the non-union subs with union subs. Since no charge of any unfair labor practice under Section 8(b)(4)(B), 29 U. S.C. § 158(b)(4)(B) [1970], has been presented to this Court, this possibility need be explored no further.
>
> The second possible motive for Council's picketing is that Council's aim is to force Pettinaro to deal with union subcontractors only, either by virtue of a subcontractor's agreement or, without such an agreement, through fear of renewed picketing by the Council at future jobsites. The N. L.R.B. chose not to pursue this theory before this Court.