**SECO, INC.**

v.

**LOCAL 135, LABORERS' INTERNATIONAL UNION**

Civ. A. No. 79–1752.

United States District Court,
E. D. Pennsylvania.

May 21, 1981.

Robert M. Goldich, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for plaintiff.

Michael Brodie, Freedman & Lorry, Philadelphia, Pa., for defendant.

## OPINION

LORD, Chief Judge.

### I. Findings of Fact

1. Seco, Inc. (Seco), is a New Jersey corporation with its principal office in Woodbridge, New Jersey.

2. At all times relevant to this action, Seco was in the business of purchasing and dismantling large pieces of industrial equipment for resale, and selling the salvaged material as scrap. It employed laborers for that purpose.

3. A substantial portion of Seco's business is conducted in states other than New Jersey, and Seco causes a substantial amount of materials to be purchased, delivered or transported in interstate commerce.

4. At all times relevant to this action, Seco's employees were represented for purposes of collective bargaining by Local 734, Laborers' International Union (Local 734), which maintains its office in New Jersey.

5. Defendant, Local 135, is a labor union representing laborers in a territory which includes parts of Montgomery County, Pennsylvania. Local 135 maintains an office in Norristown, Pennsylvania.

6. In 1978, Seco purchased four pieces of property on a job site in Conshohocken, Pennsylvania, formerly owned by the bankrupt Alan Wood Steel Company. Seco's workers arrived on the Alan Wood Steel job site in June 1978 to begin dismantling the equipment.

7. At all times relevant to this action, Daniel Woodall, Jr., was President and a Field Representative of Local 135. His duties as Field Representative included patrolling job sites within a given territory including the Alan Wood Steel site.

8. In September 1978, Woodall went on the Alan Wood Steel site and observed the activity of Seco employees. After observation and questioning of these employees, and after a brief conversation with Frank Bartolotti, Seco's job site supervisor, Woodall concluded that Seco's employees were working in more than one craft classification at a time, and were being compensated at wage rates lower than those called for by Local 135 collective bargaining agreements. He further concluded that these conditions violated the standards preserved in the area by collective bargaining between Local 135 and employers of laborers.

9. Woodall then returned to Local 135's office and discussed his findings with William Goodman, Business Manager and Chief Executive Officer of Local 135. Goodman and Woodall concluded that the problem created by Seco's practices was one for the Philadelphia Building and Construction Trades Council (Council) since the interests of more than one craft union were affected.

10. The Council is a federation of various trade unions representing separate crafts employed in the Philadelphia area building and construction industry. Each craft union local sends delegates to the Council. The number of delegates from a local craft union depends on the size of its membership.

11. The Council maintains a treasury separate from that of its local affiliates, has its own officers elected by the delegates, and generates funds by a per capita tax imposed on members of the local affiliates.

12. The Council has committees composed of delegates from member craft unions in various geographic areas, one of which is the Montgomery County Committee. At all times relevant to this action, Local 135's delegate to the Montgomery County Committee of the Council was Marvin James.

13. On October 9, 1978, the Montgomery County Committee met at the Electrician's union hall, one of the affiliated locals of the Council. Delegates of the Operating Engineers, Carpenters, Bricklayers, Electricians, Cement Masons, Duct Workers, Plumbers, Millwrights, and Teamsters were present. Ralph Williams, then Recording Secretary and Field Representative of the Council, chaired the meeting.

14. The local delegates in attendance expressed complaints about Seco's operation at the Alan Wood Steel job site similar to those set forth in paragraph 8 above.

15. On October 9, 1978, the Montgomery County Committee visited the job site where it met with Frank Bartolotti.

16. Ralph Williams acted as chief spokesman for the Committee, and attempted to question Bartolotti about the complaints of the various Committee member unions. Bartolotti advised the Committee that they should communicate with Bartolotti's superior in Seco, William Spector. Marvin James was the only Local 135 member attending the October 9th job site meeting.

17. As a result of the October 9th meeting, the Committee decided to set up an area wages and standards picket at the Seco job site. Ralph Williams implemented the decision by notifying member locals of the planned picketing and requesting them to supply picketers.

18. On October 10, 1978, the Council picketed Seco on the Alan Wood Steel job site. Ralph Williams was present throughout the picketing.

19. Local 135 and other affiliated local craft unions supplied picketers who carried signs supplied by Ralph Williams. The signs read:

NOTICE
SPECTOR [handwritten] CONTRACTOR
Is Destroying
Building Industry Standards
WE PROTEST AGAINST

Not Observing
WAGES AND STANDARDS

Philadelphia, Pennsylvania
Building and Construction Trades Council
A.F.L. - C.I.O.

20. Approximately fifty men, half of whom carried signs, picketed the entrance gate to the Seco job site. Seco employees did not cross the picket line to go to work on that day.

21. Williams decided to order no picketing of the Seco site on October 11 because of a conversation he had with Hal King, supervisor of the entire Alan Wood Steel site. King advised Williams that Seco's employees would not be on the job site on October 11.

22. In November, Al Rolli, a delegate of the Operating Engineers, a Council affiliate, advised Ralph Williams that Seco employees were again working on the Alan Wood Steel job site. Williams ordered picketing by the Council on November 13, 1978.

23. The Council picketed Seco at the Alan Wood Steel job site on November 13, 1978. The picketing was conducted in a manner identical to that which occurred on October 10. Picketers were members of various locals affiliated with the Council. They carried the same signs.

24. Council rules dictate that the Council will establish a picket line only if two or more local affiliates are affected by what the Council perceives to be problems on a job site.

25. Local 135 officers have no authority to authorize any picketing by Local 135 independent of the Council.

26. Council picketing ended after November 13 following a telephone conversation between Williams and William Spector. From this conversation Williams concluded that the only Council affiliate that had an outstanding problem with Seco was Local 135.

27. In late November, 1978, Local 135 representatives learned that Seco's employees were represented by Local 734, a sister local of the Laborers' International Union.

28. From November 1978, until March 12, 1979, Woodall drove past the Seco job site but saw no activity by any Seco workers except Bartolotti. On March 12, 1979, he saw Seco employees on the site, and, on March 13, advised William Goodman of this fact.

29. Woodall, James, and William and Tom Goodman visited the Seco job site on March 13 for the purpose of seeking compliance by the Seco employees with the transfer provision of Article XX, Section 9, of the Laborers International Union Constitution, which provides as follows:

When a good standing member of a Local Union is working within a territorial jurisdiction of another Local Union outside of the same metropolitan area, for a peri-

od of more than thirty days, the Local Union in whose area the man is working may demand a transfer from that member.

30. On March 13, Woodall read the foregoing provision to Seco's laborers, explained the provision of the Constitution to them, and advised them that, as Local 135 members, they would receive improved wages and working conditions.

31. Woodall also advised the employees that to transfer into Local 135 they would have to obtain transfer documents from Local 734.

32. Local 734's office was located in New Jersey and was not open during nonworking hours. The employees went to the office during working hours on March 13 for the purpose of obtaining transfer documents but were not successful in obtaining the documents.

33. None of the Local 135 representatives who visited the Seco job site on March 13, 1979, threatened, restrained, or coerced any Seco employee or any other person during the visit.

34. On March 14, 1979, Local 135 representatives Woodall, James, and Tom Goodman visited the Alan Wood Steel job site to find out whether Seco's employees had obtained the transfer documents from Local 734. They learned that the employees had not been able to obtain the transfers. Woodall then suggested to the employees that they could return to Local 135's hall for the purpose of having Local 135 representatives try to contact representatives of Local 734.

35. No Local 135 representative threatened any Seco employee or any other person on the job site on March 14, 1979. In addition, Local 135 representatives neither directed Seco employees to stop working nor threatened to picket the Seco job site during the March 14 job site visit.

36. Following the job site conversations of March 14, 1979, several Seco employees including Leonard Maltese, Ernest Cunningham, and Wilbert Jones, drove in Cunningham's car from the job site to Local 135's hall.

37. The employees met with William Goodman at Local 135's hall. Goodman attempted to contact Mr. Feeney of Local 734 by telephone without success. At the Local 135 hall, no Seco employee was threatened in any way.

38. No picketing by any labor organization took place at the Seco job site on March 12, 13 or 14, 1979.

## II. Discussion

Seco charges that Local 135 violated section 8(b)(4)(D) of the Labor-Management Relations Act (LMRA), 29 U.S.C. § 158(b)(4)(D),[1] by picketing Seco's job site in 1978, and by threatening Seco's employees in 1979, with the proscribed object of forcing Seco to reassign the work to Local 135 members. Seco seeks damages resulting from the claimed violations pursuant to section 303(b) of the LMRA, 29 U.S.C. § 187(b). At trial the parties agreed to bifurcate the issues of liability and damages; thus only the issue of liability is now ripe.

Seco and Local 135 agree that approximately forty to fifty men picketed Seco's job site at Alan Wood Steel on Octo-

---

1. The section reads as follows:

(b) It shall be an unfair labor practice for a labor organization or its agents . . .

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, or materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . .

(D) forcing or requiring any employee to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for such employees performing such work . . . .

ber 10 and November 13, 1978. They further agree that Local 135 representatives came on the job site again in March 1979, and spoke with Seco employees about transferring their union membership to Local 135. Seco has the burden of proving by a preponderance of the evidence that by these actions Local 135 violated the LMRA. Seco did not meet this burden of proof.

■ Seco claims that Local 135 was responsible for the 1978 picketing. However, I find that the Philadelphia Building and Trades Council (Council) organized the picketing. Council representative Ralph Williams notified the affiliate locals of the picketing. Williams supplied the signs which identified the Council as the picketing party. Williams decided when the picketing would begin and end. Local 135 participated, but only as one of several affiliate locals of the Council.

■ Seco argues that the Council acted as Local 135's agent in picketing, and thus Local 135 is responsible for the acts of the Council. Section 8(b)(4)(D) does provide that labor organizations are responsible for the acts of their agents. The existence of the agency relationship is determined by common law principles. *Kerry Coal Co. v. United Mine Workers*, 637 F.2d 957 (3d Cir. 1981).

■ The right of the principal to control the alleged agent is fundamental to the existence of the agency relationship. *NLRB v. Local 64, Falls Cities District Council of Carpenters*, 497 F.2d 1335, 1336 (6th Cir. 1974). In *Falls Cities*, the Sixth Circuit held that a local union was not responsible for the refusal of the district council, to which it belonged, to issue work permits to four non-union carpenters. The local had no control over the council's decision to issue the work permits. The local had no power to issue permits itself as all of the locals affiliated with the council had delegated that power to the council. The council was not an agent for the local even though the secretary-treasurer of the council was also the president of the local. So here, Local 135 had no power to authorize

picketing. It had no control over the Council's decision to begin or to halt picketing of Seco. Although it participated in the picketing, it did so under the control and direction of the Council. *See also Leventhal v. Building & Construction Trades Council*, 384 F.Supp. 661 (D.Del.1974) (local affiliate not agent for Building and Trades Council for picket line organized by local where Council not informed or consulted about the decision to picket, and Council had no responsibility for supervision, scheduling, or placing of the pickets).

■ The 1978 picketing violated the LMRA only if done for a proscribed object. Seco claims that the object was to force reassignment of the work to Local 135 members. Seco did not meet its burden on this claim; instead, the evidence supports Local 135's claim that the 1978 action was a legal area wages and standards picket. The purpose of an area wages and standards picket is not to organize the workers on a picketed job site but to bring the employer's costs into line with those of area union employers. The object of such a picket is to make union employers competitive with non-union employers. *NLRB v. IBEW Local 265*, 604 F.2d 1091 (8th Cir. 1979). Area wages and standards picketing therefore is lawful unless it is a pretext for an organizational or boycott picket.

The credibility of Seco's evidence on the object issue was severely compromised by contradictions between the trial testimony and earlier statements under oath of Seco witnesses. For example, Frank Bartolotti testified that Local 135's president, William Goodman, was at the October 9 meeting between Bartolotti and the Montgomery County Committee. He stated that at that meeting Goodman demanded that he sign a Local 135 collective bargaining agreement. Bartolotti made no mention of these crucial facts in the affidavit which he gave on March 15, 1979, in the NLRB proceedings in this case.

Finally, Seco did not meet its burden of proving that Local 135 representatives violated section 8(b)(4)(D) in March of 1979. Seco's evidence that Local 135 representa-

tives threatened, coerced, or restrained Seco employees lacked credibility. William Spector testified that he met with employees Hampton, Ellis, Cunningham, and Jones, on March 14, 1979, and that the four employees were afraid to work at the site because of threats by Local 135 representatives. Spector's deposition however, refers to a meeting with Jones, Maltese, Wesby, and Hogan. Leonard Maltese, still a Seco employee, testified at trial that he was frightened by the Local 135 representatives. However, it is clear that he drove to the Local 135 union hall in a fellow employee's car on March 14. There was no Local 135 representative present in the car. The one clearly neutral witness, Wilbert Jones, no longer a Seco employee or member of Local 135, stated that he heard no threats by the Local 135 representatives, that he saw no guns, and that he was not scared by what occurred on March 13 and 14, 1979. Logic supports the position of Local 135. There was no reason for Local 135 representatives to threaten the Seco employees when their union constitution provided that they had a right to demand that the employees transfer their union membership; and, more important, they were offering the employees substantially better wages and benefits.

### III. Conclusions of Law

1. Seco, Inc., is an employer as defined in section 2(2) of the Labor-Management Relations Act (LMRA), 29 U.S.C. § 152(2).

2. Local 135 is a labor organization as defined in section 2(5) of the LMRA, 29 U.S.C. § 152(5).

3. I have jurisdiction of the parties and the subject matter under section 303(b) of the LMRA, 29 U.S.C. § 187.

4. Seco has not established by a preponderance of the evidence that Local 135 engaged in, or induced or encouraged any individual employed by Seco to engage in, a strike or refusal in the course of employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities, or to perform any services, by virtue of job site activities directed against Seco in 1978.

In addition, Seco has failed to establish by a preponderance of the evidence that, in 1978, Local 135 representatives threatened, coerced, or restrained any person engaged in commerce or in an industry affecting commerce. Therefore, Seco has failed to establish by a preponderance of the evidence that Local 135 violated section 8(b)(4) of the LMRA, 29 U.S.C. § 158, by any actions of Local 135 representatives in 1978.

5. Seco has not established by a preponderance of the evidence that, in picketing the Alan Wood Steel job site in October and November of 1978, the Philadelphia Building and Construction Trades Council was acting as an agent of Local 135.

6. Seco has not established by a preponderance of the evidence that the 1978 picketing of Seco's Alan Wood Steel job site was done with an object proscribed by section 8(b)(4)(D) of the LMRA, 29 U.S.C. § 158(b)(4)(D).

7. Seco has failed to establish by a preponderance of the evidence that, in 1979, Local 135's representatives threatened, coerced, or restrained Seco or any of its employees within the meaning of section 8(b)(4)(D) of the LMRA, 29 U.S.C. § 158(b)(4)(D).