300 F.2d 317
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
HIGHWAY TRUCKDRIVERS AND HELPERS, LOCAL NO. 107,
INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF
AMERICA, INDEPENDENT, Respondent.
 No. 13607.
 United States Court of Appeals Third Circuit.
 Argued Oct. 31, 1961.
Decided Feb. 23, 1962, As Amended April 10, 1962.
 
 Warren M. Davison, Washington, D.C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., National Labor Relations Board, on the brief), for petitioner.
 Richard H. Markowitz, Philadelphia, Pa. (Paula R. Markowitz, Wilderman, Markowitz & Kirschner, Philadelphia, Pa., on the brief), for respondent.
 Before McLAUGHLIN, STALEY and FORMAN, Circuit Judges.
 STALEY, Circuit Judge.
 
 
 1
 This is a secondary boycott case in which the National Labor Relations Board ('Board') seeks enforcement of and order[1] issued against Highway Truckdrivers and Helpers, Local 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Independent ('union'). The Board found that the union, in course of a strike, violated various provisions of the Labor Management Relations Act, 1947 ('Act'), 29 U.S.C.A. 141 et seq., namely, 8(b)(1)(A), by threatening and coercing certain employees of secondary employers, and by obstructing entrance to and exit from the Riss & Company, Inc. ('Riss') terminal, and 8(b)(4)(i) and (ii)(B) by inducing and encouraging employees of neutral employers to refuse to handle Riss freight, and restraining and coercing persons engaged in commerce with an object of forcing neutral employers to stop doing business with Riss.
 
 
 2
 Riss employed a number of union members as drivers to perform local pickup and delivery services in the Philadelphia area. This operation was conducted from a Philadelphia terminal owned by persons who also held all the stock in Riss. The terminal was shared with four other freight carriers including Cartage and Terminal Corporation ('Cartage'), and Salem Express ('Salem'). On December 23, 1959, Riss notified the drivers that beginning with January 1, 1960, Cartage would perform all of Riss' local pickup and delivery work, and on December 31, 1959, each driver was sent a termination notice.
 
 
 3
 To support the 8(b)(4)(i) and (ii)(B) findings, the Board relied first on what it called the Royce incident that took place on December 29, 1959. The record shows that twice on December 29, 1959, several men unhooked a Riss trailer that was attached to a tractor driven by George Royce, an employee of Cumberland Transport. The first unhooking took place at the Riss terminal and the second at the Pennsylvania Railroad piggyback yard in Philadelphia. The Board also relies on events that occurred at the North Penn Transfer Company terminal where on January 20, 1960, a shipment was received from Riss on interline. Thereafter, North Penn employees, who were also members of the union, refused to handle Riss freight. Lastly, the Board points to picketing of the Riss terminal beginning on December 29, 1959.
 
 
 4
 The union does not challenge the Board's conclusion that a 8(b)(1)(A) unfair labor practice was committed. The attack is concentrated on the Board's finding that the union violated 8(b)(4)(i) and (ii)(B), which provide that it shall be an unfair labor practice for a union or its agents:
 
 
 5
 '(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to * * * transport, or otherwise handle or work on any goods * * * or to perform any services; or
 
 
 6
 '(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
 
 
 7
 '(B) forcing or requiring any person to cease * * * handling, transporting, or otherwise dealing in the products of any other producer, * * * or to cease doing business with any other person * * *.'
 
 
 8
 More particularly, the union contends that there is no evidence in the record showing that the men who accosted Royce were acting on behalf of the union, and that the union cannot, therefore, transporting, or otherwise dealing incident. As to the North Penn occurrence, the union says that a refusal to handle goods is simply a form of economic coercion not involving the use of force or violence which must take place before a 8(b)(4)(ii) violation can be found. As to the picketing, the union contends that in light of the fact that picketing has at all times been limited to the Riss terminal and directed against Riss only, the picketing is primary in nature and protected under the Moore Dry Dock doctrine previously enunciated by the Board.
 
 
 9
 Turning to the union's responsibility for the Royce incident, Royce testified that as he entered the Riss terminal a number of men whom he recognized as Riss drivers hailed him and asked what he was doing with a Riss trailer. After Royce said that he was delivering an empty Riss trailer to New Jersey, there same men informed him that they were on strike against Riss and ordered him to drop the trailer. The men proceeded to unhook the trailer while Royce was at a telephone calling the Salem dispatcher for further instructions. After giving a false destination, Royce drive back to the Pennsylvania Railroad yards where, while hooking up a Riss trailer, he was again approached by union pickets who unhitched his trailer and ordered him to leave and not to pick up anything with a Riss name on it. At the time these events occurred, Riss had already notified its drivers that Cartage would perform local pickup and delivery services as of January 1, 1960. The Board had before it evidence that on the day following the Royce incident, pickets representing the union appeared at the terminal and obstructed the ingress and egress of Salem trailers which were carrying Riss freight on interline. On that same day, pickets numbering from ten to twenty also blocked the agress and ingress of other trucks using the principal gate at the Riss terminal. These circumstantial facts, when coupled with Royce's recognition of some of the men as being Riss employees, leads irresistibly to the conclusion that the union, through its agents, was responsible for the Royce incident.
 
 
 10
 From an examination of the pertinent legislative history, we are convinced that 8(b)(4)(ii)(B) prohibits economic sanctions against a secondary employer in the form of a refusal by a union which represents employees of both the primary and secondary employer to handle a primary employer's goods.
 
 
 11
 Section 8(b)(4)(ii)(B) was enacted as an amendment to the Act when the Labor-Management Reporting and Disclosure Act of 1959 ('LMRDA'), 29 U.S.C.A. 401 et seq., was passed. When the LMRDA left committee and was introduced in the Senate, it contained no provisions dealing with secondary boycotts.[2] Minority members of the committee criticized this fact and recommended that 8(b)(4) be amended to make it applicable to conduct that would 'threaten, coerce or restrain any person engaged in commerce * * *.'[3] That is how the section now reads. Amendments to the Act were then offered on the floor of the Senate by Senator McClellan. Debate following introduction of the amendment indicates that its secondary boycott provisions were not restricted to the use of force or violence as a means of bringing pressure against the secondary employer, but included economic sanctions as well. Senator McClellan, who introduced the amendment, referred to it in debate, saying:
 
 
 12
 'Fourth, the amendment covers the withholding of prospective employees from a secondary employer. I refer to a case in which I may be handling the products of a given company or manufacturer, and I have an arrangement with a union whereby it furnishes employees to me when I call upon the union to furnish them. I refer to a case where I may be under a contract and under an obligaltion to use the facilities of a hiring hall to get my employees from the hiring hall. The union would say to me, 'We will not furnish you any more men, so long as you handle the products of that company.' That is another form of secondary boycott which would be prohibited.'[4]
 
 
 13
 Senator Curtis, a cosponsor of the amendment, further particularized its scope when during debate he said:
 
 
 14
 '* * * If the union, to bring pressure upon the reluctant employer, calls out on strike the employees of a different employer in order to force that employer to stop doing business with the first one, that is presently unlawful under the secondary boycott provisions of existing law. But suppose the union plays it smart. Instead of calling the strike just described, it simply goes to the second employer and says, 'Look here; you do not want any trouble with us; stop doing business with the first employer. He is giving us trouble by not signing up with us.' There is nothing in the present law to bar such direct pressure upon the second employer. * * *
 
 
 15
 'The amendment cures the above defect in existing law by making it just as unlawful to coerce second employers directly as indirectly through their employees.'[5]
 
 
 16
 The amendment was attacked during debate in the Senate largely because it was not limited to the use of force or violence.[6] The McClellan amendment was defeated.[7]
 
 
 17
 The bill passed by the House of Representatives was introduced by Representatives Landrum and Griffin as a substitute for the committee bill. The substitute reinstated the essence of the secondary boycott provisions of the McClelan amendment.[8] In analyzing that provision, Representative Griffin said:
 
 
 18
 'The courts also have held that, while a union may not induce employees of a secondary employer to strike for one of the forbidden objects, they may threaten the secondary employer, himself, with a strike or other economic retaliation in order to force him to cease doing business with a primary employer with whom the union has a dispute. This bill makes such coercion unlawful by the insertion of a clause 4(ii) forbidding threats or coercion against any person engaged in commerce or an industry affecting commerce.'[9]
 
 
 19
 Later, Representative Griffin again referred to the secondary boycott provision during debate and gave an example of what it was meant to cover. He said:
 
 
 20
 'Fourth. If, instead of going to B's employees the union official goes directly to B and threatens him with labor trouble or other consequences, unless he stops dealing with Company A-- the effect of the act can be technically avoided. Our substitute would close this loophole-- the committee bill would not.'[10]
 
 
 21
 That provision was enacted by the House and passed by the Senate after the conference committee report was accepted.[11]
 
 
 22
 The evidence here established the type of economic coercion that the Act proscribed. The record shows that on January 20, 1960, a shipment from Riss arrived at the North Penn terminal. The terminal manager himself was forced to handle the shipment after the union steward indicated that employees would not handle Riss goods unless clearance was first obtained from the union. There is substantial evidence to support the Board's conclusion that on the following day the union steward called and spoke to one of the union's business agents concerning the status of Riss goods. Unchallenged evidence shows that immediately thereafter the union steward informed the terminal manager that the employees would no longer handle Riss goods because of the union's dispute with Riss. When a shipment arrived at the North Penn terminal on January 25, the employees refused to handle the goods.
 
 
 23
 The Riss terminal constituted a common situs, i.e., a common place of operation utilized by two or more employers. A common situs situation frequently requires the courts to determine whether the picketing is primary or secondary in nature. The fine and elusive line that separates primary from secondary picketing was made holder and darker by the Board's decision in Sailors' Union of the Pacific, 92 N.L.R.B. 547 (1950)9 The Board there set out four standards, usually referred to as the Moore Dry Dock doctrine, for determining whether such picketing is presumptively valid primary activity: (1) that the picketing be limited to times when the situs of the dispute was located on secondary premises; (2) that the primary employer be engaged in his normal business at the situs; (3) that the picketing take place reasonably close to the situs; and (4) that the picketing clearly demonstrate that the dispute was only with the primary employer. Compliance with these standards, however, at most gives the picketing only presumptive validity. Local 761, International Union of Electrical Radio & Machine Workers, A.F.L.-C.I.O. v. N.L.R.B., 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). Even under that doctrine, the union must conduct its picketing so as to minimize the impact thereof on the secondary employer, Retail Fruit & Vegetable Clerks' Union, 116 N.L.R.B. 856 (1956), and where, as here, the union deliberately enmeshes secondary employers and employees in the dispute, the doctrine has no application. N.L.R.B. v. International Hod Carriers Union, 285 F.2d 397 (C.A.8, 1960), cert. denied, International Hod Carriers Bldg. & Common Laborers' Union of America, Local 1140, A.F.L.-C.I.O. v. N.L.R.B., 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 203 (1961); N.L.R.B. v. Local 294, International Brotherhood of Teamsters, 284 F.2d 887 (C.A.2, 1960); Gonzalez Chemical Industries, Inc., 128 N.L.R.B. 1352 (1960)8 reversed on other grounds, Teamsters, Chauffeurs, Warehousemen, etc. v. N.L.R.B., 110 U.S.App.D.C. 404, 293 F.2d 881 (1961).
 
 
 24
 Rather than complying with the fourth requirement of the Moore Dry Dock doctrine, the union here, by deliberate acts, made it perfectly clear that the picketing was not limited to the primary employer. On December 30, 1959, the union's pickets physically obstructed the ingress and egress of Salem trucks at the Riss terminal in those cases where Riss freight was being transported. Violence erupted a few days later. One of the several acts of violence that took place on January 4, 1960, involved a Cartage driver who was stopped by pickets as he was attempting to cross the picket line and told by a union steward carrying a meathook that 'I'll bring this down over your head if you try to move that truck out of this yard. 'I'll get you.' The same union steward told a vice president of Cartage that he was the 'son-of-a-bitch that started all of this. I'm going to get you, too.' Similar threats were made to another Cartage driver who crossed the picket line on January 7 and 11, 1960.
 
 
 25
 The union makes a final point concerning the scope of the Board's order. That order prohibited the union from inducing or encouraging any individual employed by Salem, Cartage, North Penn 'or any other person' to engage in a strike in order to force those employers to cease doing business with Riss. The order also prohibits the union from threatening, coercing, or restraining Salem, Cartage, North Penn or 'any other person' to force such persons to cease doing business with Riss. The union says that the evidence does not support the inclusion of the particular employers in the order, and that use of the phrase 'any other person' is prohibited by the Supreme Court's decision in Communications Workers of America, A.F.L.-C.I.O. v. N.L.R.B.,362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960). In regard to the question before us, the Court in N.L.R.B. v. Express Publishing Co., 312 U.S. 426, 437, 61 S.Ct. 693, 700, 85 L.Ed. 930 (1941), said:
 
 
 26
 '* * * To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past.'
 
 
 27
 A broad order is permitted where the evidence shows the existence of a general scheme, pattern or course of conduct contemptuous of the Act. N.L.R.B. v. Local 522, Lumber Drivers, 294 F.2d 811 (C.A.3, 1961).
 
 
 28
 There is a strong factual basis in the record showing that the union has unlawfully interfered with the activity of employers other than Riss. That, coupled with what the Board described as the union's obvious 'proclivity to engage in unlawful secondary activity' when and where such conduct suits its purpose convinces us that the order should be enforced in its entirety.[12]
 
 
 29
 In attacking the scope of the order, the union relied heavily on N.L.R.B. v. Ochoa Fertilizer Corp., 283 F.2d 26 (C.A.1, 1960). We need only say that after argument, that case was reversed by the Supreme Court on the very point for which it was cited here. 82 S.Ct. 344 (Dec. 18, 1961). Also, Communications Workers of America v. N.L.R.B., 362 U.S. 479, 480, 80 S.Ct. 838, 840, 4 L.Ed.2d 896, is no help for, as the Court pointed out, the union there had not 'engaged in violations against the employees of any employer other than Ohio Consolidated * * *.' That, certainly, is not this case.
 
 
 30
 A decree for enforcement of the order of the Board may be submitted.
 
 
 
 [1]
 130 N.L.R.B. No. 91
 
 
 [2]
 S.Rep. No. 187, 2 U.S.Code Cong. & Adm.News, 86th Cong., 1st Sess.1959, p. 2318
 
 
 [3]
 Id. at 2318, 2383
 
 
 [4]
 105 Cong.Rec., 86th Cong., 1st Sess., 1959, p. 6667
 
 
 [5]
 Id. at 6670
 
 
 [6]
 Id. at 6638-6671
 
 
 [7]
 Id. at 6671
 
 
 [8]
 Id. at 14347
 
 
 [9]
 Id. at 14347
 
 
 [10]
 Id. at 15532
 
 
 [11]
 Id. at 17919-17920
 
 
 [12]
 To support this conclusion, the Board cites several recent cases before it involving conduct of a similar nature by the same union. Highway Truck Drivers, Local 107, 115 N.L.R.B. 1184 (1956), and Local 107, Highway Truck Drivers, 40 L.R.R.M. 1270. Subsequent to the order before us, the Board decided Highway Truck Drivers, Local 107, 131 N.L.R.B. No. 117, which also supports its conclusion