**Peter W. HIRSCH, Regional Director of the Fourth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 1694, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, and Local 1694–1, International Longshoremen's Association, AFL–CIO, Respondents.**

Civ. A. No. 77–96.

United States District Court,
D. Delaware.

April 18, 1977.

James W. Garvin, Jr., U. S. Atty., Kent Walker, Asst. U. S. Atty., Wilmington, Del., and Leonard Leventhal, Regional Atty., Region Four, Harold Bernard, Jr., and James P. Cullen, Attys., N. L. R. B., Philadelphia, Pa., for petitioner.

Sidney R. Chirlin of Young, Conaway, Stargatt & Taylor, Wilmington, Del., and Martin J. Vigderman of Freedman, Lorry, Vigderman, Weiner & Sovel, Philadelphia, Pa., for respondents.

Peter G. Nash of Vedder, Price, Kaufman, Kammholz & Day, Washington, D. C., for charging party, Fiat Motors of North America, Inc.

Charles H. Toliver, IV, Asst. City Sol., Wilmington, Del., for the City of Wilmington.

LATCHUM, Chief Judge.

The Regional Director of the National Labor Relations Board ("NLRB" or "Board") has petitioned for a temporary injunction pursuant to § 10(*l*) of the National Labor Relations Act ("NLRA" or

"Act") as amended, 29 U.S.C. § 160(*l*).[1] The petitioner seeks to enjoin the respondents Local 1694, International Longshoremen's Association ("Local 1694") and Local 1694–1, International Longshoremen's Association ("Local 1694–1") from violating the secondary boycott provisions of § 8(b)(4)(B) of the Act, 29 U.S.C. § 158(b)(4)(B), pending adjudication by the Board of a complaint charging respondents with a violation of that provision.[2]

A hearing, which was held on March 25, 1977, and at which the parties presented witnesses, introduced exhibits, filed memoranda of law or proposed findings of fact and conclusions of law, produced the following narrative of events giving rise to this litigation.

On or about June 6, 1974, the City of Wilmington ("City") leased approximately 33 acres of land at the Wilmington Marine Terminal, which is operated by the Port of Wilmington ("Port"), to Fiat Motors of North America, Inc. ("Fiat") for its use in importing, storing and distributing Fiat automobiles to retail dealers in 26 states. While the written lease grants to Fiat the non-exclusive right to use the private roads and rail lines in the Marine Terminal, for all permitted purposes connected with the use of the demised premises, it does not expressly mention the Port-owned rail siding which is immediately contiguous to Fiat's leased premises. Nevertheless, testimony at the hearing indicates that the availability of this siding as a distribution outlet was earnestly discussed in the lease negotiations and appears to have been an important consideration inducing Fiat to locate at the Wilmington Marine Terminal. Indeed, from the beginning of the lease period in July or August 1974, until December 1976,

1. Section 10(*l*) provides in part:
"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: . . . *Provided further*, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. The service of legal process upon such officer or agent shall constitute service upon the labor organization and make such organization a party to the suit. In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158(b)(4)(D) of this title."

2. Section 8(b)(4)(B) provides:
"It shall be an unfair labor practice for a labor organization or its agents—
(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."

the City sanctioned and never questioned Fiat's non-exclusive right to use of the rail siding for loading its automobiles onto rail cars. Employees of Fiat who are represented by a local Teamsters union perform the loading work as required by the collective-bargaining agreement between Fiat and the Teamsters.

In February 1976, after Local 1694–1 was certified[3] as the bargaining representative for the longshoremen employed by the Port, Arthur Wilson, who is president of Local 1694, and Roosevelt Johnson, who is president of Local 1694–1, complained to Fiat and to the Port Director about the allocation of the Fiat loading work to members of the Teamsters Union of Fiat rather than to Port employees. The respondents, again through Wilson and Johnson, also pressed their claim to the loading work during and after contract negotiations between the City and the local union.

Finally, in November and December 1976, the Port Director, at least partly in response to the concerted pressure exerted by Wilson and Johnson,[4] informed Fiat that Local 1694–1 claimed the right to any work at the rail siding and that if Fiat refused to accede to this claim the City would withdraw its consent to Fiat's use of the rail siding. However, on the morning of December 29, 1976, Fiat employees and officials gathered at the rail siding in order to load automobiles for shipment out of Wilmington. Johnson was informed of this and was also advised to keep his men away from that area to avoid any conflict between employees of the Port and Fiat. But after conferring with Wilson concerning Fiat's intentions, Johnson ordered his men off their jobs, even though he was warned by the Assistant Port Director that such action constituted a breach of Local 1694–1's "no-strike" agreement with the City.

Meanwhile, after driving to the rail siding Wilson proceeded to block Fiat's loading operations by parking his automobile in front of the loading ramp and vociferously complained to several Fiat officials, insisting that the loading work belonged to Local 1694–1 and threatening Fiat with trouble unless the work was awarded to the longshoremen. Confronted by this threat and the vehement remonstrations by the leaders of both local unions, Fiat ceased using the rail siding and filed with the Board a complaint and amended complaint charging respondents with violating § 8(b)(4)(B) of the Act.

At the hearing the respondents, through Wilson and Johnson, offered testimony which, briefly, indicated that (1) the work stoppage was in response to threats of violence by members of the Teamsters organization, (2) respondents were merely pressuring their employer, the City, to preserve work to which Local 1694–1 is lawfully entitled by virtue of a collective-bargaining agreement with the City, (3) respondents were not seeking to claim work which belonged to Fiat employees, and (4) Wilson did not block Fiat's loading ramp, but attempted only to assuage what appeared to him to be a tense situation and to remind Fiat that the City had revoked its right to continue using the rail siding.

■ At the outset it is important to recognize that the Court's responsibility in a § 10(*l*) proceeding is confined to determining whether the Board has reasonable cause to believe "that the elements of an unfair labor practice are present," whether the legal theory upon which the Regional Director proceeds is "substantial and not frivolous," and whether the granting of equitable relief is "just and proper."[5] It is not

---

3. Actually the election conducted and the certification of exclusive bargaining agent was for Local 1694, International Longshoremen's Association AFL–CIO (PX 4 & 5) and the Port entered into this union contract with Local 1694 on behalf of Local 1694–1 (PX 5a).

4. The Port Director stated on cross examination that the Port was also interested in having the work performed by Local 1694–1 because

the Port receives a fee for the performance of such work; however, the value of these fees compared to the Port's revenue generated by Fiat's operation was not revealed.

5. *Hirsch v. Building & Construction Trades Council of Philadelphia & Vicinity*, 530 F.2d 298, 302 (C.A. 3, 1976); *Samoff v. Building & Construction Trades Council of Philadelphia & Vicinity*, 475 F.2d 203, 207 (C.A. 3, 1973), *va-*

the Court's task to resolve factual differences, make credibility determinations, or to make any other determination on the merits which will bind the parties in subsequent proceedings.[6] The Regional Director thus shoulders a "relatively insubstantial" burden of proof in a § 10(*l*) proceeding.[7]

The respondents in this case rely on two defenses to defeat the Board's right to a preliminary injunction. First they contend the Board and the Court lack jurisdiction over the subject matter of this controversy on the ground that Local 1694–1 is not a "labor organization or its agent" within the meaning of § 8(b)(4)(B) of the Act.[8] Fiat and the Board have contrived federal jurisdiction, they argue, by alleging that the respondents are engaged in a joint venture making Local 1694–1 liable as an agent of Local 1694, which qualifies as a labor organization, for actions which violate § 8(b)(4)(B). Secondly, the respondents argue that any coercive activity engaged in by them was intended to preserve Local 1694–1's work as guaranteed by a lawful collective-bargaining agreement with the City.

The first argument, however, misconstrues the Court's limited responsibility in a § 10(*l*) proceeding. The Court is not required to determine whether respondents were or were not in fact participating in a joint venture seeking to acquire Fiat's loading work for Local 1694–1. Rather the Court need only determine whether on the present record the Board has reasonable cause to believe the respondents engaged in such a joint venture.[9] The latter limited determination, of course, will not bind the parties in subsequent proceedings since it is the Board's responsibility as the primary fact finder in cases arising under the NLRA to ultimately resolve factual controversies, subject only to the right of appellate review pursuant to § 10(e), (f) of the Act. While the record is far from conclusive in this case, the evidence adduced at the hearing satisfies the Court that the Board has reasonable cause to believe the respondents engaged in a joint venture and that Local 1694–1 acted as an agent for Local 1694. Moreover, since a labor union, even though not itself a labor organization, may be held responsible for an unfair labor practice if it acted as an agent for a labor organization,[10] the Board's legal theory clearly satisfies the "substantial and not frivolous" standard.

In support of their second argument respondents assert the right of employees "to pressure their employer to preserve for themselves work traditionally done by them." [11] Respondents thus contend that their conduct was and is addressed only to labor relations with their contracting employer (the City) and that they were therefore engaged in privileged primary activity,

---

cated for mootness, 414 U.S. 808, 94 S.Ct. 151, 38 L.Ed.2d 44 (1973); *Schauffler v. Local 1291, International Longshoremen's Association,* 292 F.2d 182, 187 (C.A. 3, 1961); *Samoff v. Building & Construction Trades Council of Delaware,* 378 F.Supp. 261, 271 (D.Del.1974).

6. *Schauffler v. Local 1291, supra.*

7. *Hirsch v. Building & Construction Trades Council, supra.*

8. The petitioner concedes that Local 1694–1 is not a labor organization within the meaning of the Act because it represents only employees of an employer, the City of Wilmington, which is exempt from the Act's coverage. See 29 U.S.C. § 152(2), (5). That Local 1694 qualifies as a labor organization is not disputed by either party, however.

9. Respondents contend the record fails to show whether Wilson was in fact acting in his official capacity as president of Local 1694 and that logically he had no interest in the disputed loading work which was claimed only by Local 1694–1. However, Wilson's close relationship with Johnson and the Port longshoremen, his repeated efforts to secure the loading work for Local 1694–1, and his role in the work stoppage, supports the Board's contrary initial determination that respondents, through Wilson and Johnson, were engaged in a joint venture. *Cf. NLRB v. Highway Truckdrivers & Helpers, Local 107,* 300 F.2d 317 (C.A. 3, 1962); *NLRB v. Brewery & Beer Distributor Drivers, Helpers & Platform Men, Local 830,* 281 F.2d 319 (C.A. 3, 1960).

10. *National Marine Engineers Beneficial Assn. v. NLRB,* 274 F.2d 167 (C.A. 2, 1960).

11. *National Woodwork Manufacturers Assn. v. NLRB,* 386 U.S. 612, 635, 87 S.Ct. 1250, 1263, 18 L.Ed.2d 357 (1967).

not in proscribed secondary activity. The Regional Director argues that the respondents not only seek to acquire work they never had, which is true, but also that their employer never controlled that work and had no power to award it to them. In order to accomplish their work objectives, therefore, the respondents had to exert pressure on Fiat, as well as their own employer, in a manner violative of § 8(b)(4)(B).

It can hardly be disputed that coercion or inducement existed within the meaning of § 8(b)(4)(B). The issue is whether the Board has reasonable cause to believe that an object of the inducement or coercion was to cause the cease-doing-business consequences prohibited by § 8(b)(4)(B), the resolution of which turns on whether the work stoppage was "addressed to the labor relations of [the City] . . . vis a vis [its] own employees, . . . or whether [the respondents' conduct] was tactically calculated to satisfy [their] objectives elsewhere." [12]

■ The Court is satisfied after reviewing the entire record that the Board has reasonable cause to believe the respondents' conduct violated § 8(b)(4)(B) of the Act. The disputed loading work could not be secured by pressure on the City alone; pressure had to be exerted on Fiat directly and through the Port to obtain respondents' work objectives. That respondents may also have wanted to enforce their contract and convince the City not to permit employers who refused to employ respondent's workers to use Port property does not alter the fact that the respondents stopped work, and threatened to continue the work stoppage, until Fiat's loading work belonged to them.[13] The Board therefore had reasonable cause to believe the respondents' objectives were not limited to their employment relationship with the City but included the object of influencing Fiat in a manner proscribed by § 8(b)(4)(B).[14] Furthermore, based on the evidence offered by the Board, the Court is unable to say that the legal theory upon which it proceeds is frivolous or insubstantial.

Accordingly, the Court will grant the injunction sought by the Board and enters the following findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

## FINDINGS OF FACT

1. Petitioner is Regional Director of the Fourth Region of the National Labor Relations Board, an agency of the United States, and filed this petition for and on behalf of the Board.

2. Fiat Motors of North America, Inc., pursuant to the provisions of the NLRA, filed a charge with the Board on or about January 3, 1977, and an amended charge on or about March 11, 1977, alleging that Local 1694, International Longshoremen's Association, AFL–CIO, and Local 1694–1 International Longshoremen's Association, AFL–CIO, a labor organization and an agent of a labor organization respectively, have engaged in, and are engaging in, unfair labor practices within the meaning of Section 8(b)(4)(B) of the Act.

3. The aforesaid charge and amended charge were referred to the petitioner as Regional Director of the Fourth Region of the Board.

4. There is, and the petitioner has, reasonable cause to believe that:

(a) Local 1694 is an unincorporated association in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rate of pay, hours of employment, or conditions of work.

---

**12.** *See NLRB v. Enterprise Assn. of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine & General Pipefitters,* —— U.S. ——, ——, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977).

**13.** *See Enterprise Association, supra,* —— U.S. at ——, 97 S.Ct. 891.

**14.** The Board is not required to find that the *sole* object of respondents' strike was secondary so long as one of the respondents' objectives was to influence Fiat by inducing or coercing the City or the Port to cease doing business with Fiat. *See NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

(b) Local 1694 maintains its principal office in Wilmington, Delaware, and at all times material herein has been engaged within this judicial district in transacting business and in promoting and protecting the interest of its employee members.

(c) At all times material herein, Local 1694–1 has been an agent of Local 1694 and acted in concert with Local 1694.

(d) At all times material herein, Arthur Wilson has been president of Local 1694 and has acted as an agent of Local 1694 and Local 1694–1.

(e) At all times material herein, Roosevelt Johnson has been president of Local 1694–1 and has acted as an agent of Local 1694–1 and Local 1694.

(f) At all times material herein, Fiat, a New York corporation, has been engaged in the importation and distribution of automobiles at the Port of Wilmington, Delaware, and in the operation of its business during the past year shipped goods valued in excess of $500,000 to firms located outside the State of Delaware.

(g) The Port of Wilmington is a division of the Department of Commerce, an agency of the City of Wilmington, Delaware, and is engaged in operating the Wilmington Marine Terminal. On or about June 6, 1974, the City of Wilmington leased certain property located at the Port to Fiat for its use in the importation and distribution of automobiles.

(h) On or about December 29, 1976, the respondents, through Arthur Wilson and Roosevelt Johnson, induced and encouraged individuals employed by the Port to refuse to work.

(i) On or about December 29, 1976, the respondents, through Arthur Wilson and Roosevelt Johnson, threatened the Port with a work stoppage if Fiat continued to load automobiles on rail cars at the Port's rail siding.

(j) On or about December 29, 1976, the respondents, through Arthur Wilson, blocked the loading of automobiles on rail cars at the Port's rail siding and threatened Fiat, and individuals employed by Fiat, with trouble if Fiat attempted to load the automobiles.

(k) By the acts and conduct set forth in Finding of Fact 4 subparagraphs (h) and (j) above, the respondents have engaged in and have induced or encouraged individuals employed by Fiat and by the Port to engage in a strike or refusal in the course of their employment to transport or otherwise handle or work on any goods, articles or materials, or to perform any services, and by the acts and conduct set forth in Finding of Fact 4 subparagraphs (h), (i), and (j) above, the respondents have threatened, coerced and restrained Fiat and the Port.

(*l*) An object of the acts and conduct of the respondents set forth in Finding of Fact 4 subparagraphs (h), (i), (j), and (k) above was and is to force or require Fiat and the Port to cease handling, transporting or otherwise dealing in the products of each other and to cease doing business with each other.

5. It may fairly be anticipated that, unless enjoined, the respondents will continue or repeat the acts and conduct set forth in Finding of Fact 4 subparagraphs (h) through (*l*) above or similar acts or conduct.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of this proceeding and is empowered to grant injunctive relied pursuant to § 10(*l*) of the Act.

2. There is, and the petitioner has, reasonable cause to believe that:

(a) Local 1694 is a labor organization within the meaning of §§ 2(5), 8(b) and 10(*l*) of the Act, and Local 1694–1 is an agent of a labor organization within the meaning of § 8(b) of the Act.

(b) Fiat is engaged in commerce within the meaning of § 2(6) and (7) of the Act.

(c) Respondents have engaged in unfair labor practices within the meaning of § 8(b)(4)(B) of the Act, in a manner that affects commerce within the meaning of § 2(6) and (7) of the Act and a repetition of these practices will impair the policies of the Act as set forth in § 1 thereof.

**1108**

3. To preserve the issues for the orderly determination provided in the Act, it is appropriate, just and proper that pending the final adjudication of the matters involved herein and pending before the Board, the respondents, their officers, representatives, agents, servants, employees, and all members or persons acting in concert with them, be enjoined and restrained from the commission, continuation, or repetition of the acts and conduct set forth in Findings of Fact 4(h), (i), and (j) above, and all related acts or conduct in support thereof, the commission of which may fairly be anticipated from respondents' past acts and conduct.

An order will be entered in accordance with this memorandum opinion.